STATE ex rel. EDWARD T. YOUNG v. HASCAL R. BRILL

and Others.[1]

Nos. 15,099—(208).

April 1, 1907.

**Act Unconstitutional.**

Sp. Laws 1883, p. 189, c. 51, in so far as it requires the judges of the district court of Ramsey county to appoint the members of the board of control of such county, is unconstitutional, because imposing on the judiciary duties belonging to another department of the government.

April 12, 1907.

**Nonjudicial Function.**

Chapters 51 and 54, pp. 189, 192, Sp. Laws 1883, in so far as they require the judges of the district court, or a majority of them, to appoint the members of the board of control of the county of Ramsey, are unconstitutional, because they assume to impose upon members of the judicial department powers and functions which are by the constitution of the state assigned to another department of the government.

[1]Reported in 111 N. W. 294, 639.

Order from the supreme court upon relation of Edward T. Young, attorney general, requiring Hascal R. Brill, William Louis Kelly, Olin B. Lewis, George L. Bunn, Grier Orr and Oscar Hallam, as judges of the Second judicial district of the state of Minnesota, to show cause why a peremptory writ of mandamus should not be issued commanding them to appoint a member of the board of control of Ramsey county. Respondents' motion to quash the information, to discharge the order and to dismiss the proceedings granted,

*Edward. T. Young,* Attorney General, *C. S. Jelley,* Assistant Attorney General, and *Durment & Moore,* for relator.

*Charles E. Otis* and *W. H. Lightner,* for respondents.

On April 1, 1907, the following opinion was filed:

PER CURIAM.

The relator, the attorney general of the state, applied to this court for a writ of mandamus to compel the judges of the district court of the Second judicial district of the state to appoint a member of the board of control of Ramsey county, as provided by Sp. Laws 1883, p. 189, c. 51. An order to show cause why the writ should not issue was made, and upon the return the respondents appeared and moved to discharge the order and dismiss the proceedings upon the ground that the statute which assumed to impose the duty of making such appointment is unconstitutional and void, because it imposes upon the judiciary duties and functions which are not judicial and which belong to another department of the government of the state.

We are satisfied that Sp. Laws 1883, p. 189, c. 51, in so far as it requires the judges of the district court to appoint the members of the board of control, is unconstitutional. The order is therefore discharged, and the proceedings dismissed. An opinion will be filed hereafter.

On April 12, 1907, the following opinion was filed:

ELLIOTT, J.

In 1872 the legislature enacted a special law, entitled "An act to authorize the county of Ramsey and city of St. Paul to issue bonds to build an almshouse and hospital and for other purposes." [2] It provided for the erection, maintenance, and operation of an almshouse

[2] Printed in Laws 1902, p. 165.

and hospital at the joint expense of the city and county, and placed them under the control of three directors, who were to be appointed by the board of county commissioners and the common council of the city. These directors were given the usual powers of executive and administrative officers, and were charged with the "duties now enjoined upon the overseers of the poor by the general statutes of the state." In the following year the original act was so amended as to provide for the erection of a hospital separate from the almshouse, but both institutions were left under the control of the directors. Chapter 45, p. 233, Sp. Laws 1873. In 1876 another statute provided that these directors, who were then referred to as the "board of control," should be citizens and freeholders of the county of Ramsey. Chapter 77, p. 154, Sp. Laws 1876. In 1883 the method of appointing the members of this board was changed, and it was provided that "the judges of the district court of the Second (2d) judicial district, county of Ramsey, state of Minnesota, or a majority of them, are hereby authorized and empowered at any time they may deem proper, to appoint three (3) directors, citizens and freeholders of said county of Ramsey, who shall constitute the board of control of said county and each shall hold his appointment at the pleasure of the authority appointing them." Sp. Laws 1883, p. 192, c. 54. At the same session of the legislature this act was amended by adding the words: "Provided, that the terms of office of the three (3) directors as constituted by this act, shall expire on the first (1st) day of July, (1883) and thereupon the said judges of the district court shall appoint one (1) director for the term of one (1) year, (1) one director for the term of two (2) years, and one (1) director for the term of three (3) years, and thereafter as such terms expire, the directors shall be appointed for the term of three (3) years and it is hereby required that the auditor of Ramsey county and the comptroller of the city of St. Paul shall each examine the books and affairs of the said board of directors and make a full report thereon to the board of county commissioners of Ramsey county and the common council of the city of St. Paul, respectively, at least once each year." Sp. Laws 1883, p. 189, c. 51. The almshouse and hospital which were erected under the authority conferred by these statutes have been managed by the directors,

or so-called "board of control," who have also performed the usual duties of overseers of the poor.

From time to time the judges of the district court made certain appointments under the statutes, but now refuse to fill a vacancy which has occurred in the board, for the reason, as alleged, that the statute originally and as amended is unconstitutional, because it attempts to confer powers and impose duties other than judicial upon the judiciary. The relator, the attorney general of the state, presented an information to this court and prayed that a writ of mandamus issue commanding the judges of the district court to fill the vacancy now existing in the board of control of Ramsey county. An order to show cause was thereupon issued, and upon the return day the respondents appeared and moved to discharge the order and dismiss the action on the ground that the several acts of the legislature referred to in the information, so far as they, or any of them, purport to confer or impose upon the respondents the duty of appointing the members or directors of the said board of control, are unconstitutional. The relator contends that the duties imposed by these statutes are judicial in character; that, even if they are not judicial, they may properly be imposed upon the courts by the legislature without violating any constitutional provision; that the legislature may require the members of the judicial department of the state government to perform any services which will not interfere with the proper exercise of the powers which are expressly conferred upon them by the constitution; and that no distinction in this respect is made between judicial and nonjudicial functions. The argument is plausible, and is urged with ability and ingenuity.

1. The question involved in this case is of such importance that we feel justified in stating the history of the doctrine of the separation of powers, and examining with some care and at considerable length the cases in which it has been considered.

(a) The tendency to sacrifice established principles of constitutional government in order to secure centralized control and high efficiency in administration may easily be carried so far as to endanger the very foundations upon which our system of government rests. That system, devised and elaborated with infinite care and wide knowledge of history and political theory, rests upon certain conceded fundamental

principles. The structure which was erected is not simple. It is complex; the parts interrelated and dependent. It was deliberately framed and adopted for the purpose of effecting a change from the system which prevailed on the continent of Europe and to a certain extent in the colonies, and which had earnest and skilful advocates among political writers such as John Milton in England, Turgot in France, and Franklin in America, who argued for a sovereign legislative body, in which all political power should be vested. But the people were not willing to trust everything to a single person or collection of persons. They had heard that a wise and benevolent despot is the best of all possible rulers, but they had learned that rulers are not always wise and benevolent. A single legislative body, with full control over executive and judicial action, was to their minds as full of possible danger as a single despotic ruler. They were unwilling to trust any man or body of men with the uncontrolled exercise of all the powers of government.

Constitution-making began with the states and culminated in the constitution of the nation. The idea that the powers of the government should be distributed among different bodies of men had taken possession of the minds of the statesmen and people of the formative period. They were familiar with the contrary theory, and with the works of the political writers in which such theories were advocated. But they believed, with Paley, that "the first maxim of a free state is that the law should be made by one set of men and administered by another; in other words, that the legislative and judicial character be kept separate. When these offices were united in the same person or assembly, particular laws are made for particular cases, springing oftentimes from particular motives and directed to private ends. Whilst they are kept separate, general laws are made by one body of men without foreseeing whom they may affect; and, when made, they must be applied by the other, let them affect whom they will." They had read in Montesquieu's Spirit of Laws that "when the legislative and executive powers are united in the same person or in the same body of magistrates there can be no liberty. * * * Again, there is no liberty if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subjects would be exposed to arbitrary control, for the judge

would be then the legislator. Were it joined to the executive power, the judge might behave with violence and oppression. .There would be an end of everything were the same man or the same body * * * to exercise those three powers, that of enacting laws, that of executing the public resolutions and of trying the causes of individuals." Their Blackstone taught them that "in this distinct and separate existence of the judicial power in a peculiar body of men, nominated indeed, but not removable at pleasure, by the crown, consists one main preservative of public liberty, which cannot subsist long in any state unless the administration of common justice be in some degree separated from the legislative and also from the executive power." Paley's Moral Philosophy, bk. 6, c. 8; Montesquieu, Spirit of Laws, bk. 11, c. 6; Blackstone, Comm. bk. 1, c. 7, p. 269 (Hammond's Ed.)

In speaking of· the old constitution of Virginia, Jefferson said: "All the powers of government, legislative, executive, and judicial, result to the legislative body. The concentrating these in the same hands is the precise definition of a despotic government. It will be no alleviation that these powers will be exercised by a plurality of hands and not a single one." Jefferson, Notes on Virginia, p. 195; 1 Story, Const. Law, § 525.

Prior to 1787 twelve commonwealths adopted constitutions, and of these six inserted therein a general clause distributing the principal govermental powers among the executive, legislative, and judicial departments. The first constitution of Massachusetts, adopted in 1780 (part 1, art. 30), provided that "in the government of this commonwealth the legislative department shall never exercise the executive and judicial powers or either of them; the executive shall never exercise the legislative and judicial powers or either of them; the judicial shall never exercise the legislative and executive powers or either of them, to the end it may be a government of laws and not of men." The constitution of New Hampshire, adopted in 1784 (part 1, art. 1, § 37), declared that "the legislative, executive and judicial [powers] ought to be kept as separate from and independent of each other as the nature of a free government will admit, or as is consistent with that chain of ·connection that binds the whole fabric of the constitution in one indissoluble bond, of union and amity." Maryland declared "that the legislative, executive, and judicial powers of government

ought to be forever separate and distinct from each other." See Board v. Todd, 97 Md. 247, 54 Atl. 963, 62 L. R. A. 809, 99 Am. St. 438.

After the general adoption of this form of government by the former colonies, and before the meeting of the constitutional convention of 1787, Turgot published a pamphlet which criticised the Americans for their departure from that simple form with power concentrated in the legislature which was so attractive to the philosophical mind. In reply to this, John Adams published his famous defense of American government, which is a veritable storehouse of political history and theory, and which served to confirm American statesmen in the correctness of the theories which they had adopted.

When the national convention of 1787 met, it adopted as its first resolution that "a national government ought to be established consisting of a supreme legislature, judiciary and executive." Journals of the Convention, pp. 82–83, 129, 207, 215. "From this fundamental proposition," says Judge Story, "sprang the subsequent organization of the whole government of the United States, and it lies at the bottom of all our constitutions, state as well as national." See The Federalist (Lodge's Ed.) No. 47; Webster's Works, vol. 4, p. 122. Since that time all the states, except New York, Pennsylvania, Ohio, Wisconsin, Kansas, Delaware, North Dakota, and Washington, have adopted constitutions which contain a distributing clause expressly providing for the division of governmental powers among three departments. All the states that have adopted this clause, except Rhode Island, Connecticut, and North Carolina, have further provided that no person or persons exercising the functions of one department shall assume or discharge the functions of any other department. The constitutions of all the states, except Rhode Island, Connecticut, New Jersey, North Carolina, Louisiana, New Hampshire, Massachusetts, Maryland, Virginia, West Virginia, and South Carolina, provide that the powers shall be separated except in cases expressly directed or permitted. South Dakota provides that "the powers of the government of the state are divided into three distinct departments, the legislative, executive and judicial; and the powers and duties of each are prescribed by this constitution." (Article 2.)

The constitution of the United States and the constitutions of New York, Pennsylvania, Ohio, Wisconsin, Kansas, Delaware, Washington,

and North Dakota contain no general distributing clause. In Ohio it is provided, however, that the legislature can exercise no judicial powers not expressly conferred by the constitution.

The constitution of every state, except New York, expressly vests by separate provisions the legislative powers in the legislature, the executive in the governor and certain other officers, and the judicial in the judiciary.

Irrespective of the existence of a distributing clause, it is held that the creation of these departments operates as an apportionment of the different classes of powers. Poore, Fed. and State Constitutions and Charters; Stimson, Am. St. Law, § 200; Bondy's Separation of Governmental Powers, c. 3. As all departments derive their authority from the same constitution, there is an implied exclusion of each department from exercising the functions of the others. In Dash v. Van Kleeck, 7 Johns. 477, 5 Am. Dec. 291, Chancellor Kent said: If the provision that the legislative and judicial powers shall be preserved separate and distinct "be not found in our own constitution in terms, it exists there in substance; in the organization and distribution of the powers of the departments." In Wynehamer v. People, 13 N. Y. 378, 391, Judge Comstock said: "I entertain no doubt that, aside from the special limitations of the constitution, the legislature cannot exercise powers which are in their nature essentially judicial or executive." In People v. Keeler, 99 N. Y. 463, 2 N. E. 615, 52 Am. 49, the court, after referring to the distribution of powers in the constitution of the United States, said: "Although no similar declaration is contained in the constitution of this state, still it is a recognized principle that, in the division of power among the great departments of government, the judicial power has been committed to the judiciary, as the executive power has been committed to the executive department, and the legislative to the legislature." The doctrine of the separation of powers with the limitations expressly provided for in the various constitutions, is thus of general application in the United States.

(b) The constitution of the United States does not in terms prohibit one department of the government from exercising the powers which are therein conferred upon either of the other departments, but the federal courts have uniformly held that only judicial functions may be

imposed upon the judiciary. This prohibition results by implication from the character of the government which is created under the constitution. Soon after the federal government went into operation, congress, on March 23, 1792, by an act entitled "An act to provide for the settlement of the claims of widows and orphans, barred by the limitations heretofore established, and to regulate the claims to invalid pensions" (1 St. 243), required the circuit courts of the United States to hear the petitions of persons who applied to be placed on the pension lists. By the statute the decision of the court as to the right of the petitioner to a pension was made subject to the further consideration and approval of the secretary of war and congress. At this period in the history of the country the duty of the courts to declare legislative acts invalid when in conflict with the paramount law was not fully recognized, although it had been exercised in several instances during the colonial time. 5 Pol. Sci. Quar. 224. All the federal judges seemed to have been satisfied that this statute, although beneficent in purpose, was pernicious in principle, and tended to confuse and obliterate the lines which had been drawn by the constitution between the departments of the government.

Chief Justice Jay, Justice Cushing, and District Judge Duane, in the New York district, declined to act as judges, but consented to perform the duties imposed by the act as commissioners. In a memorandum stating their views the judges agreed: "That by the constitution of the United States, the government thereof is divided into three distinct and independent branches, and that it is the duty of each to abstain from and to oppose encroachment on either. That neither the legislature nor the executive branches can constitutionally assign to the judicial any duties but such as are properly judicial and to be performed in a judicial manner. That the duties assigned to the circuit courts by this act are not of that description, and that the act itself does not appear to contemplate them as such. * * * As, therefore, the business assigned to this court by the act is not judicial, nor directed to be performed judicially, the act can only be considered as appointing commissioners for the purposes mentioned in it, by official instead of personal descriptions. That the judges of this court regard themselves as being the commissioners designated by the act, and therefore as being at liberty to accept or decline that office. That as the objects of

this act are exceedingly benevolent, and do real honor to the humanity and justice of congress, and as the judges desire to manifest on all proper occasions and in every proper manner their high respect for the national legislature, they will execute this act in the capacity of commissioners."

In the district of Pennsylvania, Justices Wilson and Blair and District Judge Peters reached the same conclusion, but thought proper to express to the president "the sentiments which on a late painful occasion governed us with regard to an act passed by the legislature of the Union." In this remarkable letter the judges call attention to the division of power made by the national constitution and say: "It is a. principle important to freedom that in government the judicial should be distinct from and independent of the legislative department. To this important principle the people of the United States in forming their constitution have manifested the highest regard." Two reasons are assigned why the courts should not act under the law: "First. Because the business directed by this act is not of a judicial nature. It forms no part of the power vested by the constitution in the courts of the United States. The circuit court must consequently have proceeded without constitutional authority. Second. Because, if upon that business the court had proceeded, its judgments (for its opinions are its judgments) might under the same act have been revised and controlled by the legislature and by an officer in the executive department. Such revision and control we deemed radically inconsistent with the independence of that judicial power which is vested in the courts."

Justice Iredell and District Judge Sitgreaves in the district of North Carolina also communicated to the president their reasons for declining to act under the law.

These opinions and letters are printed in a note to Hayburn's Case, 2 Dall. 409, 1 L. Ed. 436, and in part in Ex parte Riebeling (D. C.) 70 Fed. 310.

In 1792 an application was made to the supreme court of the United States for a writ of mandamus to compel the circuit court to act under the statute. The question was fully argued and the case was submitted, but before a decision was rendered the objectionable provisions of the statute were repealed by congress. Before the act was repealed, how-

ever, Chief Justice Jay and Justice Cushing had acted upon their con-
struction of the original act, and certain pensions had been granted in
accordance with their findings. There was a difference of opinion as
to whether the judges, while refusing to act as courts, could legally act
as commissioners. In repealing the questionable sections of the act of
1792, congress attempted to save all rights to pensions which might
be founded "upon any legal adjudication" under the act of 1792, and
made it the duty of the secretary of war, in connection with the attorney
general, to take such measures as might be necessary to obtain an ad-
judication of the supreme court "on the validity of such rights, claimed
under the act, theretofore saved, by the determination of certain per-
sons styling themselves 'commissioners.'" In May 1792, Chief Jus-
tice Jay and Justice Cushing, styling themselves "commissioners," had
determined that one Yale Todd ought to be placed on the pension list,
and, this conclusion being approved by the secretary of war, as provid-
ed by the act, Todd was placed on the pension list, and thereafter cer-
tain money was paid to him as a pension. An action was then brought
by the United States against Todd to recover money had and received
by him for the use of the United States. The case came on for hearing
at the February term, 1794, and after full argument judgment was
rendered in favor of the United States. No opinion was filed, but
from a statement prepared by Chief Justice Taney and published as
a note to United States v. Ferreira, 13 How. (U. S.) 52, 14 L. Ed.
42, it appears that the opinion was unanimous, and therefore Chief
Justice Jay and Justice Cushing must, after further consideration, have
reached the conclusion that the power given to the court could not be
construed to authorize the judges to act out of court as commissioners.

The treaty of 1819 between the United States and Spain provided
that "The United States will cause satisfaction to be made for the in-
juries, if any, which by process of law shall be established to have been
suffered by the Spanish officers and individual Spanish inhabitants by
the late operations of the American army in Florida." (Article 9.)
For the purpose of carrying this provision into effect, congress, by
acts passed in 1823 and 1824, directed the judge of the territorial court
of Florida to receive, examine, and adjudge all cases of claims for
losses and report his decisions, if in favor of the claimants, together
with the evidence on which they were founded, to the secretary of the

treasury, who, on being satisfied that the same were just and equitable within the provisions of the treaty, should pay the amount thereof. The district court treated this act as conferring judicial power, but the supreme court of the United States regarded it as authorizing the judge to act as a commissioner, and held that it did not involve the exercise of judicial power. The court, without knowledge of the decision in the Todd case, seems to have assumed the validity of the acts done under the act as commissioners, but dismissed the appeal because the decision of the commissioner was not the judgment of the court, but a mere award, and therefore not appealable.

The leading case of Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377, determined the right of the house of representatives to punish for contempt a person who refused to answer certain questions put to him by the committee of the house. In the course of an elaborate consideration of the judicial power of the house of representatives, Mr. Justice Miller said: "It is believed to be one of the chief merits of the American system of written constitutional law that all the powers intrusted to government, whether state or national, are divided into the three grand departments, the executive, the legislative, and the judicial; that the functions appropriate to each of these branches of government shall be vested in a separate body of public servants; and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other."

In U. S. v. Waters, 133 U. S. 208, 10 Sup. Ct. 249, 33 L. Ed. 594, it was held that the determination and the allowance of an attorney's fee was a judicial act, which was not subject to revision by the attorney general of the United States, who could exercise executive powers only.

Gordon v. U. S., 2 Wall. (U. S.) 561, 17 L. Ed. 921, 117 U. S. 697, append., involved the right of the supreme court to review the action of the court of claims in respect to a claim examined and allowed by that court under an act of congress which provided that no money

should be paid out of the treasury for any claim passed upon by the court of claims until after an appropriation therefor should be estimated by the secretary of the treasury and an appropriation to pay it made by congress. Neither the court of claims nor the supreme court could do anything more than certify an opinion to the secretary of the treasury, and that officer at his discretion included it in his estimates, and it then rested with congress to determine whether the claim should be paid. An appeal from the court of claims was dismissed upon the ground that congress could not "authorize or require this court to express an opinion on a case where its judicial power could not be exercised, and where its judgment would not be final and conclusive upon the rights of the parties, and process of execution awarded to carry it into effect."

The same principle was applied in Re Sanborn, 148 U. S. 222, 13 Sup. Ct. 577, 37 L. Ed. 429. In Interstate Commerce Commission v. Brimson, 154 U. S. 447, 14 Sup. Ct. 1125, 38 L. Ed. 1047, the earlier cases were reviewed, and it was held that the twelfth section of the interstate commerce act (Act March 3, 1887, c. 359, 24 Stat. 507 [U. S. Comp. St. 1901, p. 756]), which authorized the court to use its process in aid of inquiries before the interstate commerce commission, imposed judicial duties only upon the court. "The views we have expressed in the present case," said Mr. Justice Harlan, "are not inconsistent with anything said or decided in those cases. They do not in any manner infringe upon the salutary doctrine that congress (excluding the special cases provided for in the constitution, as, for instance, in section 2 of article 2 of that instrument) may not impose upon the courts of the United States any duties not strictly judicial."

Ex parte Gans (D. C.) 17 Fed. 471, arose upon the application of an informer, who had secured the conviction of smugglers, for a certificate of the value of his services for the information of the secretary of the treasury as required by section 6 of the act of congress of June 22, 1874 (18 Stat. 187, c. 391 [U. S. Comp. St. 1901, p. 2020]). The act was held void because it attempted to impose nonjudicial power upon the judges. "This court," said Judge Treat, "cannot usurp jurisdiction nor enter upon other than judicial duties." To the same effect, see Ex parte Riebeling (D. C.) 70 Fed. 310, and United States v. Queen (D. C.) 105 Fed. 269.

(c) An examination of a few of the many cases in which the state courts have applied the doctrine of the separation of powers will show that they are generally in accord with the federal cases. While there is some conflict in so far as the results in the particular cases are concerned, there is very little difference of opinion as to the importance and force of the general doctrine.

In re Town of Mt. Morris, 41 Hun (N. Y.) 29, illustrates the nature of judicial power. The statutes under consideration provided that, whenever adjoining towns were liable to construct a bridge over a stream dividing such towns, three freeholders might petition the commissioners of highways, and, if they refused to repair or build the bridge for any cause the freeholders, upon affidavit and notice of motion, might apply to the supreme court or to a judge thereof at chambers, for an order requiring such commissioners to act, and the court or judge should make an order thereon as the justice of the case required. If the motion was granted, the judge or court was required to specify the amount of money needed, and how much thereof should be raised by each town. "To determine the liability of towns to erect and maintain bridges, to enforce such liability, and to order the mode in which it shall be performed, are acts peculiarly judicial in their character. An analogous appellate jurisdiction in respect to the laying out, altering, or discontinuing roads has for a long time been vested in the courts by statute."

In re Davies, 168 N. Y. 89, 61 N. E. 118, 56 L. R. A. 855, resembles Interstate Commerce Comm. v. Brimson, supra. The New York antimonopoly act authorized the attorney general, whenever he determined to commence an action under the statute, to present to any justice of the supreme court an application in writing for an order directing the persons mentioned therein to appear before such justice or a referee and answer such questions as may be put to them. It was made the duty of the justice to grant such an order upon a proper application. After the testimony was taken it was to be filed in the office of the clerk of the county in which the order for the examination was filed. The duty thus imposed upon the justices was held to be judicial in character, because incidental to a judicial proceeding; judicial in form, because the justice was not required to grant the order as a matter of course, but must exercise the judicial function of deciding whether the

applicant made out a case pursuant to the statute; and judicial in substance, because the object of the act was to secure testimony in relation to violations of the law. "Free government," said Judge Vann, "consists of three departments, each with distinct and independent powers designed to operate as a check upon those of the other two co-ordinate branches. The legislative department makes the laws while the executive executes and the judiciary construes and applies them. Each department is confined to its own functions and can neither encroach upon, nor be made subordinate to those of another without violating the fundamental principle of a republican form of government." Attention is called to the recent practice of conferring upon the justices of the supreme court many administrative duties and it is remarked that "a distinction seems to prevail in practice between powers conferred upon a court and those conferred upon the judges thereof."

A recent case which illustrates the nature of the judicial power is Citizens v. Town, 173 N. Y. 215, 65 N. E. 978. An act relating to the construction of highways running through two or more towns of the same county provided that, upon the presentation of a petition to the supreme or county court, "the said court shall carefully consider the facts therein alleged and if it shall be satisfied that the said highway is necessary for the public welfare and convenience, and that its continuation and construction will afford a nearer route between two populous points in two towns than by any existing highway, then the said court may make an order directing that a notice shall be published * * * of the time and place when an application for commissioners shall be made, and at said time and place said court may make an order appointing three commissioners," etc. With one judge dissenting, the act was sustained as against the objection that it conferred nonjudicial power upon the court.

The New Jersey decisions are not entirely consistent. In Re Cleveland, 51 N. J. L. 311, 17 Atl. 772, and Schwarz v. Mayor, 68 N. J. L. 576, 53 Atl. 214, the rule that nonjudicial duties cannot be imposed upon the judiciary was applied. In Moreau v. Board, 68 N. J. L. 480, 53 Atl. 208, a statute authorizing boards of freeholders to acquire additional accommodations for holding the court provided that as a preliminary step the justice of the supreme court presiding in the district

100 M.—33

should file with the clerk a request that the board should either purchase land and erect a building thereon or lease a building at some place in the county other than the present county seat; that, if he should deem it advisable to purchase land, he should designate the location of the building and file the plans and specifications for the building; if he should deem it advisable to rent a building, he should designate the building and the term of years; and in all cases he was required to specify the total amount of money to be expended, not to exceed a maximum sum named in the statute. It was discretionary with the judge to take the preliminary steps. The act was held invalid. The court took cognizance of the fact that the county where the proceeding arose was already supplied with a satisfactory courthouse and therefore the rule applied in Board v. Gwin, 136 Ind. 562, 36 N. E. 237, 22 L. R. A. 402, that a constitutional court has inherent power to provide temporary quarters, when necessary, in which to hold its sessions, was not applicable. "The matters confided to the justice by this statute," said the court, "are whether, not the necessities of the courts, but the convenience of the public, makes an additional courthouse desirable; whether a permanent or temporary courthouse should be acquired, in what locality, outside of the present county seat, it should be situate, and of what style it should be, in order most to subserve the public convenience, and what expenditure therefor would best accord with the other demands upon the public treasury. These matters, in our judgment, 'properly belong' to the legislative department. * * * We do not mean that the legislature itself must pass directly upon them, for undoubtedly it may delegate their decision to appropriate bodies; but persons belonging to or constituting the executive or judicial department of government are by the constitution precluded from such delegation."

In Ross v. Board, 69 N. J. L. 291, 55 Atl. 310, the court departed somewhat from the rule which it had recognized in previous cases, and held that the legislature might confer upon the judges the power to appoint the members of a board of park commissioners. In view of the history of the state, it was held that the power to appoint such local officials was not by the constitution devolved upon either of the three departments, and might therefore be imposed upon either department without violating the constitutional provision. In Eckert v. Perth

Amboy, 66 N. J. Eq. 437, 57 Atl. 438, a statute which required the court of chancery, upon petition, to determine when the conditions were such as to require gates and bars to be erected at a railway crossing, was valid. The procedure provided for by the act was held to be "clearly judicial in character and strictly within judicial cognizance." It will be noticed that the New Jersey courts recognize that there are some governmental powers which are not necessarily either executive, legislative, or judicial in character, and may therefore be by the legislature distributed among the different departments in such manner as to it seems most desirable.

In County v. Mitchell, 97 Md. 330, 55 Atl. 673, the act under consideration placed the courthouse and grounds in the care and custody of the crier of the court, who was by the constitution required to be appointed by the court. The act thus imposed upon the crier duties which did not belong to his office, and it was held unconstitutional because it required "the judges to discharge nonjudicial functions, indirectly it is true, but just as objectionable as if directly done, and possibly more so."

In Board v. Todd, 97 Md. 247, 62 L. R. A. 809, 54 Atl. 963, 99 Am. St. 438, it was held that the judges could not be required to receive and act upon petitions for the submission to the voters of the question whether or not intoxicating liquors could be sold. After referring to the history of the provisions of the state constitution, the court said: "It would seem thus to be made evident in our fundamental law that the policy and intent of that law is that the courts and judges provided for in our system shall not only not be required, but shall not be permitted, to exercise any power or to perform any trust or to assume any duty not pertaining to or connected with the administering of the judicial function."

In Robey v. County, 92 Md. 150, 48 Atl. 48, it was held that the statute which required the judges of the circuit court to approve the accounts of certain officers before payment thereof by the county commissioners imposed nonjudicial duties and was unconstitutional. "The mere fact," said the court, "that a judge is called on by statute to execute a certain function, does not make the function a judicial function. Its character is dependent on its qualities, not on the mere accident as to

the person who has been designated to do it." See, also, State v. Chase, 5 Har. & J. 298; McCrea v. Roberts, 89 Md. 251, 43 Atl. 39, 44 L. R. A. 445.

In Beasley v. Ridout, 94 Md. 641, 52 Atl. 61, a statute giving the control of the county jail to a board of visitors to be appointed by the judges of the circuit court was held invalid as an attempt to confer a nonjudicial power of appointment on the judges in violation of article 8 of the declaration of rights, which declares that a person exercising the functions of either the executive, legislative, or judicial branch of the government shall not exercise any function of any other department.

In State v. Barker, 116 Iowa, 96, 89 N. W. 204, 57 L. R. A. 244, 93 Am. St. 222, a statute directing the district judges to appoint the trustees of waterworks of certain cities was held void because it imposed nonjudicial functions upon the judiciary. The court said: "The appointment of trustees to manage and control a system of waterworks belonging to a municipal corporation in advance of litigation or of any dispute concerning their management or control is surely not a judicial function. It is more nearly administrative. But with the affairs of the corporation and the management of its property courts have nothing to do in advance of some dispute. If courts are to select city officials, they may also select those who are to administer the affairs of the county, and it is not going too far to say that they may also be authorized to select state officials." This case is very similar to the one at bar, and is a direct authority for the doctrine contended for by the respondents.

In State v. Rogers, 71 Oh. St. 203, 73 N. E. 461, an act conferring upon the judge of the court of common pleas the duty of fixing the future compensation of county surveyors was held void as an attempt to impose legislative duties which could not be delegated. The constitution of Ohio does not expressly forbid the conferring of power belonging to one branch of the state government on any co-ordinate branch. But the fact that the powers of government are distributed by the constitution to different departments of the government was held to evidence a purpose that the powers and duties of each shall

be separate from, and independent of, the powers and duties of the other co-ordinate branches. By implication this distribution operates as a limitation upon and a prohibition of the right to confer or impose upon either powers that belong distinctively to one of the other branches.

In City v. Zanesville, 64 Oh. St. 67, 59 N. E. 781, 52 L. R. A. 150, 83 Am. St. 725 (reversing 63 Oh. St. 442, 59 N. E. 109), it was held that a statute which authorized a probate court to direct in what manner a telephone company's lines should be constructed when the telephone company and the municipal authorities fail to agree, did not confer legislative authority upon the courts. It was said that, unless it is reasonably certain that the particular power belongs exclusively to the legislative or executive departments, the fact that it is conferred by the legislature upon a judicial tribunal in the first instance is decisive of the character of the power.

In case of Supervisors of Election, 114 Mass. 247, 19 Am. 341, it was held that a statute which designated the justices of the supreme court to appoint supervisors of election was void as an attempt to confer nonjudicial power upon the judiciary.

Connecticut retained her colonial charter until 1818, and all legislative and judicial power was vested in the assembly. The earlier cases decided under the new constitution adopted the view that there was not an entire separation of powers. But in Appeal of Norwalk Street Ry. Co., 69 Conn. 576, 37 Atl. 1080, 38 Atl. 708, 39 L. R. A. 794, this theory was repudiated. A statute provided that, before any railway company should construct its road in the streets of a city, the plans for construction should be approved by the city authorities, or the superior court, or a judge thereof, on appeal. This was held to be an attempt to confer other than judicial power upon the judiciary. Hamersley, J., said: "The so-called 'appeal' in this case is not a process to invoke the judicial power. It is simply an application to the superior court to exercise a legislative function." Mr. Justice Baldwin dissented on various grounds, one of which was that in his opinion the appeal might fairly be regarded as a judicial proceeding, calling for the exercise of judicial power.

In Bradley v. City, 73 Conn. 646, 48 Atl. 960, an act which author-

ized a valuation of the taxable property in New Haven, and provided that all persons who were dissatisfied therewith might file a statement with the board of relief, and from its action appeal to the supreme court, was held invalid. "The valuation," said Mr. Justice Torrance, "which the court is asked to make in such cases, is not made in the exercise of any judicial power or function; nor is it made as incident to the exercise of any such power or function. It is made as part of an administrative act or process for a purpose purely administrative; and it is an act which under this legislation is required of the superior court as a court, and not as a special statutory tribunal. We think such action as is required of the court under this special legislation falls clearly without the limits of the judicial department. If the court can be empowered to aid others in performing the work called for by this special legislation, it is difficult to see why it cannot be empowered to do the entire work without the aid of others; and, if this be so, then it is still more difficult to see why it cannot be empowered to do any administrative act whatsoever."

In Burgoyne v. Board, 5 Cal. 9, it was held that the legislature could not confer other than judicial functions upon the court of sessions. The statute required the judges of this court to purchase the site for a courthouse. See, also, Phelan v. County, 6 Cal. 532, 20 Cal. 40. These cases were in part overruled by People v. Provines, 34 Cal. 520. See, also, Jones v. Buzzard, 2 Ark. 415.

The power to create municipal corporations and to enlarge or contract their boundaries is legislative, and cannot be exercised by the courts. State v. Simons, 32 Minn. 540, 21 N. W. 750; Metcalf v, State, 49 Oh. St. 586, 31 N. E. 1076; Forsyth v. City of Hammond, 71 Fed. 443, 18 C. C. A. 175; Commissioners of Laramie County v. Commissioners of Albany County, 92 U. S. 307, 23 L. Ed. 552. See, however, City v. Leebrick, 43 Iowa, 252; People v. Bennett, 29 Mich. 451, 18 Am. 107; City v. Hawkinson, 75 Ill. 152. But the legislature may provide that certain specific facts and conditions, the existence of which is made a condition precedent to the creation of a municipal corporation, shall be ascertained and determined by a court, and, if they are established, the courts shall make an order based thereon.

The legislature must determine the question of public policy—whether the public interests require the incorporation or the extension or contraction of boundaries. The line between legislative and judicial functions is illustrated by State v. Simons, 32 Minn. 540, 21 N. W. 750, where the act in question was held void because it attempted to delegate legislative power to the courts. See, also, Grover Hill v. McClure, 5 Oh. C. C. 376; City v. Leimbach, 68 Kan. 37, 74 Pac. 598, 63 L. R. A. 630, 104 Am. St. 384; City v. Dickinson, 23 Neb. 426, 36 N. W. 813. In State v. George, 22 Or. 142, 29 Pac. 356, 16 L. R. A. 737, 29 Am. St. 586, it was held not a delegation of legislative power to require the judges of the circuit court to appoint a bridge committee, nor was the exercise of such power thought to be inconsistent with the proper exercise of judicial functions.

In Houseman v. Montgomery, 58 Mich. 364, 25 N. W. 369, the statute provided that the collection of a tax or assessment should not be enjoined or held void in consequence of any irregularity; but the court in which the proceedings were pending should allow the plaintiff to come in and show cause wherein he had been injured. On the application of either party the court was required to appoint some person to examine the premises and survey the same, and on the final hearing thereafter make such an order as should be just and equitable. The duties which the act imposed, said the court, "are not judicial in their nature, but belong to the administrative branch of the government. The sending out surveyors or other persons to make examination or surveys, to re-levy taxes in place of invalid ones, are each and all acts which do not pertain to the judicial branch of the government. The design of the constitution is that each of the three branches of the government shall be kept, so far as practicable, separate, and that one of the departments shall not exercise the powers confided by that instrument to either of the others. Any legislation, therefore, authorizing an invasion of this design, and conferring upon the judiciary the exercise of powers belonging to either of the others, cannot be regarded as valid."

The courts of Kentucky have been somewhat liberal in sustaining acts which impose other than strictly judicial duties upon the courts. See Morton v. Woodford, 99 Ky. 367, 35 S. W. 1112; Speed v. Crawford, 60 Ky. 207; Hoertz v. Jefferson, 119 Ky. 824, 84 S. W. 1141.

The constitution of Pennsylvania provides that "no duties shall be imposed by law upon the supreme court, or any of the judges thereof, except such as are judicial, nor shall any of the judges thereof exercise any power of appointment except as herein provided." (Const. art. 5, § 21.) Under this provision it is held that nonjudicial duties may be imposed upon the other state courts. Commonwealth v. Collier, 213 Pa. St. 138, 62 Atl. 567. The courts of Indiana have adopted the theory that the judiciary may be required to perform nonjudicial functions, if such particular functions are not by the constitution specifically assigned to either the executive or legislative department of the state government. See Board v. Moore, 161 Ind. 426, 68 N. E. 905; City v. Evansville, 149 Ind. 174, 46 N. E. 77, 37 L. R. A. 189; Baltimore v. Town, 161 Ind. 228, 68 N. E. 266. In Board v. Moore, supra, a statute which authorized a justice of the peace to appoint some person to take charge of an insane person was held valid. In the earlier case of Board v. Gwin, 136 Ind. 562, 36 N. E. 237, 22 L. R. A. 402, it was held that, while the courts can exercise judicial power only, they have certain inherent powers which are necessary to enable them to act, such as to punish for contempt and to cause the courthouse to be repaired. For further illustration of the distinction between the different kinds of power, see State v. Judge, 50 N. J. L. 585, 15 Atl. 272, 1 L. R. A. 86; State v. Board, 52 N. J. L. 512, 19 Atl. 972; State v. Assessors, 43 N. J. L. 338; In re Cleveland, 51 N. J. L. 311, 17 Atl. 772; Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co., 110 U. S. 667, 4 Sup. Ct. 185, 28 L. Ed. 291; Auditor v. Atchison, 6 Kan. 500. The authorities are thus not entirely harmonious. No attempt has been made to refer to all the cases which consider the nature of governmental powers, but those cited disclose the general course of the decisions.

(d) The previous decisions of this court are entirely consistent in their recognition of the general principle of the separation of powers. Article 3 of the constitution provides that "the powers of the government shall be divided into three distinct departments, legislative, executive and judicial; and no person or persons belonging to, or constituting one of these departments shall exercise any of the powers properly belonging to either of the others, except in the instances expressly

provided in this constitution." Section 1 of article 6 designates the courts in which the judicial power of the state shall be vested.

In Sanborn v. Commissioners of Rice County, 9 Minn. 258 (273), an act which required the·board of county commissioners to meet, audit, adjust,·and fix the claims of a certain individual against the school district of the county, and required that the board should vote a tax upon taxable property of a district for the payment of the claims so audited, was held invalid as an attempt to confer judicial power upon the commissioners. "To meet, audit, adjust, and fix the claims" is the ordinary and appropriate duty of courts of justice. It is a duty purely judicial in its nature and consequences. "Each department of government," said the court, "is strictly confined within its appropriate sphere, and an attempt to exercise any power properly belonging to either of the other departments is not only unauthorized, but positively forbidden."·

In Re Senate, 10 Minn. 56 (78), a statute which authorized either branch of the legislature to call for the opinion of the supreme court, or any one of the judges thereof, was held unconstitutional. "The powers and duties of each department," said Mr. Justice McMillan, "are distinctly defined. The departments are independent of each other to the extent, at least, that neither can exercise any of the powers of the others not expressly provided for. * * * This not only prevents an assumption by either department of power not properly belonging to it, but also prohibits the imposition by one of any duty upon either of the others not within the scope of its jurisdiction; and 'it is the duty of each to abstain from and to oppose encroachments on either.' Any departure from these important principles must be attended with evil."

Home Ins. Co. of St. Paul v. Flint, 13 Minn. 228 (244), illustrates the nature of judicial power. A statute required county attorneys to examine into the financial condition of insurance companies, and if in the opinion of the examiner the company did not possess the amount of capital or assets required by law, or had not in other material matters complied with the law, he was required to certify the same to the state treasurer. On an application for a writ of prohibition to restrain the county attorney of Ramsey county from making the examination required by the act, it was held that the·writ would issue

only to restrain the exercise of judicial power, and that the powers conferred upon the county attorney by this statute were not judicial. The court said: "If the word is used in the ordinary and legal acceptance, clearly there is nothing judicial in the making of the examination and certificate required.  *  *  *  A judicial investigation proceeds after notice, and eventuates in a judgment which is the final determination of the rights of the parties, unless reversed by an appellate tribunal. The necessity of notice in the inception and the conclusive character of the determination are perhaps as good a test as any other as to what proceedings are judicial." The court recognizes that acts may be of a judicial nature, and yet not strictly judicial. In Rice v. Austin, 19 Minn. 74 (103), 18 Am. 330, the court, following In re Senate, supra, declined to comply with the request of the governor to give its opinion as to the constitutionality of an act of the legislature.

On an application for a writ of mandamus, directed to the governor of the state, commanding him to execute and deliver to the petitioner a deed of certain lands under the provisions of an existing statute, it was held that the ministerial duties imposed by the statute were not subject to the control of the judiciary. The court said: "The constitutional provision by which the departments of government are made distinct and independent are broad and general, and recognize no such distinction. If the judicial department can so far control the executive as to compel the performance of ministerial duties, then the two are no more distinct and independent, except in degree, than if the judiciary could compel the executive to perform all its duties, whatever their nature."

In State v. Young, 29 Minn. 474, 9 N. W. 737, the statute which provided for the adjustment of the Minnesota state railroad bonds was held void, because it attempted to delegate legislative power to the judiciary.

In State v. Ueland, 30 Minn. 29, 14 N. W. 58, the duty and power imposed upon judges of probate by section 124, c. 10, G. S. 1878, in respect to the incorporation of cities, was held not to be judicial, and the statute was therefore sustained as against the objection that it conferred upon probate courts judicial power beyond that authorized by the constitution. The court said: "Is the power thus attempted to be conferred judicial? The presenting of the petition to the judge

and his action thereon has no semblance to a judicial proceeding, other than that it is before a judicial officer. No one is summoned before him. No notice of it is given. There are no parties. There is no trial. He decides no controversy, determines no rights. His order, when properly called in question, as by quo warranto, would not have the conclusive effect of a judicial decision. It is true, he ought, before issuing the order, to ascertain certain facts, as the number of inhabitants within the designated territory, and the relative number of voters signing the petition; but no mode of ascertaining those facts, by the testimony of witnesses or otherwise, is prescribed. There appears no reason why he should not act on his personal knowledge. That a duty cast on an officer, judicial or ministerial, involves the ascertaining of facts, does not of itself make the duty a judicial one. Home Ins. Co. v. Flint, 13 Minn. 228 (244). In a great variety of instances the statute imposes, sometimes on judicial, sometimes on ministerial, officers, duties involving the determination of facts and the exercise of discretion, but which no one would claim required the exercise of judicial power. This is the character of the duty and power imposed and conferred on judges of probate by the act in question. It is not obnoxious to the objection made."

In Foreman v. Board of County Commrs. of Hennepin County, 64 Minn. 371, 67 N. W. 207, attention was called to the fact that in State v. Ueland the rule that neither the executive nor the legislative branches of the government can constitutionally assign to the judiciary any duties but such as are properly judicial and to be performed in a judicial manner was overlooked. Chapter 73, p. 72, Laws 1883, provided for the incorporation of villages upon petition to the judge of the district court. In State v. Simons, 32 Minn. 540, 21 N. W. 750, an act was held void as conferring legislative power upon the courts. After stating the rule that legislative power cannot be delegated, the court said: "The present act assumes to delegate these legislative powers to the district court, a tribunal not authorized to exercise them; its jurisdiction under the constitution being purely judicial." In Foreman v. Board of County Commrs. of Hennepin County, supra, chapter 156, p. 338, Laws 1895, was held invalid because it imposed upon the probate court judicial power beyond that authorized by the constitution. The court said: "The precise line of cleavage between judicial and

ministerial functions never has been, and never can be, definitely located. There are many duties which may be either the one or the other, depending upon the officer or body performing them, and the effect to be given to the action or determination of such officer or body. When duties of this ambiguous or equivocal nature are imposed upon a judicial officer or tribunal, to whom none but judicial duties can be constitutionally assigned, the doubt should be solved in favor of the validity of the statute, and the duties held to be judicial, and the presumption indulged in that the legislature intended them to be performed in a judicial manner." In the course of the opinion the court said: "If we were to hold that these powers and duties are merely ministerial in their nature, it would not aid the plaintiff; for it is a fundamental principle of American constitutional law, that neither the legislative nor executive branches of the government can constitutionally assign to the judiciary any duties but such as are properly judicial, and to be performed in a judicial manner."

The power to lay out and open highways is legislative in its nature, and in no sense, except in some of its details, judicial; but G. S. 1878, c. 13, § 76, which provided for the so-called judicial highways, was sustained as a special judicial proceeding analogous to that which was provided for the condemnation of rights of way for railway purposes. State v. MacDonald, 26 Minn. 445, 4 N. W. 1107; State v. Ensign, 55 Minn. 278, 56 N. W. 1006. In State v. Crosby, 92 Minn. 176, 99 N. W. 636, which sustained the constitutionality of the drainage act, the court, after referring to these cases, said: "If a statute of that nature be within constitutional limitations and valid * * * no reason occurs to us why a statute conferring upon the district courts power to lay out and establish ditches and drains should not also be held valid. Though the power and authority in each case is legislative in character, in carrying out and applying the statute the exercise of judicial functions is also involved." In McGee v. Board of County Commrs. of Hennepin County, 84 Minn. 472, 88 N. W. 6, chapter 88, Laws 1897, was held to delegate to the board of county commissioners the legislative duty of exercising the power of eminent domain, and to impose upon the district court the judicial function of determining whether a certain improvement was for a public use.

The right to determine in the first instance what are reasonable railroad rates is not a judicial power, and therefore cannot be imposed upon the courts. Steenerson v. Great Northern Ry. Co., 69 Minn. 353, 72 N. W. 713; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014.

State v. Crosby, supra, noted a modern tendency to sustain statutes which impose duties of an uncertain or mixed character upon the courts; and in State v. Bates, 96 Minn. 110, 104 N. W. 709, it was said that governmental powers are not in their nature necessarily either executive, legislative, or judicial. That is, some of the powers of government, as was said in Foreman v. Board of County Commrs. of Hennepin County, supra, may be of such an uncertain and ambiguous nature as not to fall clearly within either class, and therefore may be assigned by the legislature to either department of the government. These cases do not in the least limit the rule that the representatives of neither department shall exercise the powers which are by the constitution expressly or by implication from the frame of the government conferred upon other departments.

2. The statute under consideration requires the judges of the district court to appoint the members of the board of control of the city of St. Paul. Although there are some decisions to the contrary, it is generally conceded that the power to appoint to a public office is in its nature an executive function. State v. Barker, 116 Iowa, 96, 89 N. W. 204, 57 L. R. A. 244, 93 Am. St. 222; In re Supervisors, 114 Mass. 247, 19 Am. 341; State v. Washburn, 167 Mo. 680, 67 S. W. 592, 90 Am. St. 430; Mechem, Pub. Off. § 104, and cases there cited. This seems to be inferable from the fact that the constitution makes the appointment of officers one of the principal duties of the executive. Article 5, § 4, defines the power of the governor, and provides that "he shall have power by and with the advice and consent of the senate to appoint a state librarian and notaries public and such other officers as may be provided by law." While such appointments are thus in their nature executive, there are some exceptions which are necessary in order that the several departments may exercise their express powers and functions without embarrassment. Within this exception are appointments made by judicial officers in discharge of their judicial

duties, and this includes the appointment of subordinate officers and employees immediately connected with the court. The legislature may, within the same exception, appoint the officers necessary to enable it to properly discharge its duty as an independent body. Such appointments are necessary to enable each department to maintain its independent existence, and do not involve an encroachment upon the functions of the other branches of the government. Rockwell v. Fillmore County, 47 Minn. 219, 49 N. W. 690; State v. Westfall, 85 Minn. 437, 89 N. W. 175, 57 L. R. A. 297, 89 Am. St. 571; State v. Denny, 118 Ind. 449, 21 N. E. 274, 4 L. R. A. 65; Board v. Gwin, 136 Ind. 562, 36 N. E. 237, 22 L. R. A. 402; In re Janitor, 35 Wis. 410; State v. Smith, 15 Mo. App. 412; State v. Hyde, 121 Ind. 20, 22 N. E. 644.

The members of the board of control, which this statute requires the judges to appoint, have no connection with the judiciary. They are charged with the administration of important affairs which are remote from the duties of the courts, and they are under the complete control of the other departments of the government. If the district judges can be required to appoint the members of this board, there is no reason why they may not be required to appoint the mayor, the members of the board of public works, the county commissioners, the chief of police, and all other city and county officers. The supreme court may as well be required to appoint the state board of control, the bank examiner, the regents of the state university, and the members of all other numerous state boards and commissions. If the legislature may require the courts to make these appointments, there seems to be no reason why it cannot also require them to supervise their appointees, remove them, investigate their actions, report concerning their administration, and even administer the departments themselves. Such a doctrine would render nugatory the constitutional prohibition and entirely revolutionize the system of government.

The suggestion that the judges of the district court may be compelled to act as individuals, instead of as judges, is not pertinent to this case. The statute purports to impose the duty upon "the judges of the district court of the Second judicial district, county of Ramsey, state of Minnesota, or a majority thereof." It requires them to act as judicial officers. Its mandate is directed to the judges of the district

court, and not to the individuals who for the time occupy the official positions. It does not assume to impose a duty upon individuals. The petition prayed for a writ directed to the parties named "as judges of the district court," etc., and the order to show cause is so directed. The power of the legislature to impose a duty of this character upon an individual and compel its performance is not involved in this case.

We have not discussed the policy of imposing other than judicial functions upon the judiciary, but it is apparent that the founders of our system of government intended to confine the courts to their judicial duties, and thus prevent them from becoming involved in the turmoil of political life. The disposition to impose such nonjudicial functions upon the judges is manifestly due to the public confidence in their fairness and disinterestedness, and to the belief that they will not be influenced by selfish, unworthy, or partisan motives. It is possible that for a time the public would be benefited by the performance of such functions by the court, but the inevitable result in the end would be to lessen its efficiency and prestige as the guardian and conservator of the constitution and laws and the rights of individuals under the law. In view of the fact that appointments have heretofore been made by the judges under the authority of this statute, it is proper to state that the persons thus appointed are de facto officers, and their acts as such are valid.

Our conclusion is that chapters 51 and 54, pp. 189, 192, of the Special Laws of 1883, in so far as they require the judges of the district court, or a majority of them, to appoint the directors or members of the board of control of Ramsey county, are unconstitutional, because they assume to impose upon the members of the judiciary powers and functions which are by the constitution of the state assigned to another department of the government.

The order to show cause is therefore discharged, the writ denied, and the proceedings dismissed.