# STATE EX REL. CLIFFORD L. HILTON, ATTORNEY GENERAL v. CITY OF NASHWAUK AND OTHERS.[1]

No. 22,681.

February 3, 1922.

### City of fourth class—Act of 1921.

1. Chapter 462, Laws 1921, provides that the inhabitants of contiguous territory not organized as a city and having not less than 1,000 nor more than 10,000 inhabitants may become incorporated as a city of the fourth class; that whenever two-thirds of the legal voters residing within the limits of such territory, whether part of it is in a village or not, shall present to the judge of probate of the county, a petition in designated form, the inhabitants of said territory shall thereupon be a city, and the judge of probate shall issue an order declaring it so, and in said order shall designate the time and place of holding the first city election; that the officers of any village embraced within the territory shall act until officers of the city are elected.

### Constitutionality of act.

2. The statute imposes upon the judge of probate duties not judicial and is to that extent unconstitutional and void, but the invalid portion is separable from the remainder of the act and the main portion of the act is sustained.

### Not a delegation of legislative power.

3. The act is not a delegation of legislative power. The application of the statute is simply conditional on local action.

### Incorporation of urban territory authorized.

4. The act authorizes the incorporation only of territory urban in character.

### Act not void because of limitation to smaller cities.

5. The application of the act only to cities of from 1,000 to 10,000 inhabitants does not render it void.

### Whole act not void because of unconstitutional provisions.

6. If the act contains provisions, void because they grant unconstitutional privileges to a certain class of cities, the whole act does not therefore fail.

[1]Reported in 186 N. W. 694, 189 N. W. 592.

July 21, 1922.

Incorporation denied when taxable property rather than lands and people subject to single municipality have been included.

7. Under Laws 1921, c. 462, providing for the incorporation of a city upon presenting to the judge of probate of the county a petition signed by the requisite number of voters, the territory incorporated must be so conditioned as to be properly subjected to municipal government; and while the question of incorporation is legislative in character, primarily for the voters, they do not have unlimited legislative discretion. The question whether the territory is so conditioned as to be properly subject to municipal government is a fundamental condition to incorporation and will be considered by the court, and if it appears that it is not, and that the limits of the territory have been fixed so as to reach taxable property rather than lands and people properly subject to a single municipal government, the incorporation will not be sustained.

Upon the relation of Clifford L. Hilton, Attorney General, the supreme court issued its writ directed to the city of Nashwauk and the officers of the village of Nashwauk, to show quo warranto the city of Nashwauk claimed the right to exist or to be a city or to exercise jurisdiction, control or authority over the territory attempted to be embraced therein, and the individual defendants claimed to exercise the official powers referred to in the information, and the inhabitants of the territory claimed to be a body politic. Respondents made return, to which the state replied and demurred to that part of the answer setting up the proceedings to incorporate the village of Cooley and alleging that the state was estopped from questioning the validity of the incorporation, as not sufficient to constitute a defense. The state moved for judgment of ouster upon the pleadings on the ground that chapter 462, Laws of 1921, is unconstitutional. Respondents' motion to quash the writ upon the pleadings was granted and the opinion of February 3 was filed. After the filing of that opinion relator's motion to vacate the order for judgment of ouster and for a trial of the questions of fact in issue upon the pleadings, and to be permitted to amend its information by inserting a map of the territory proposed to be incorporated

in the city and an additional paragraph describing the physical characteristics of that territory, was granted and a referee was appointed to take testimony. The individual respondents demurred to the amended information and moved to quash the writ and dismiss the case as to them. The city of Nashwauk filed its separate answer to the amended information, testimony was taken and returned to the court and the questions reargued. Writ of ouster ordered.

*Clifford L. Hilton*, Attorney General, and *Butler, Mitchell & Doherty*, for relator.

*Alfred L. Thwing* and *A. B. Dahl*, for respondents.

HALLAM, J.

1. This is a proceeding in quo warranto against the city of Nashwauk and individuals, who, it is alleged, claim to be acting as officers of the city. Judgment of ouster is asked because the statute under which the city was incorporated, namely, chapter 462, p. 724, Laws of 1921, is alleged to be unconstitutional and because the territory included within the city does not fall within the terms of the statute.

Chapter 462, p. 724, Laws of 1921, reads as follows:

"Section 1. **Cities of fourth class may be incorporated— Procedure.** The inhabitants of contiguous territory not organized as a city and having not less than one thousand (1,000) inhabitants and not more than ten thousand (10,000) inhabitants may become incorporated as a city of the Fourth Class as hereinafter provided:

"Whenever two-thirds (2/3) of the legal voters residing within the limits of such territory, whether all or part of such territory had been theretofore organized into a borough or village, or not, and which territory they desire to have incorporated as a city shall sign and have presented to the Judge of Probate of the county in which such territory is situated a petition setting forth the metes and bounds of said city and of the several wards thereof, and praying that said city may be incorporated under such name as may therein be designated, the Judge of Probate shall issue an order declaring such territory duly incorporated as a city and shall designate the

metes, bounds, wards and name thereof as in said petition described. And the said Judge of Probate shall in said order designate the time and place of holding the first election of officers for said city."

"Section 2. **Powers of cities of fourth class.** Upon presenting the petition aforesaid to the Judge of Probate as aforesaid, the inhabitants within the metes and bounds therein described shall thenceforth be a body politic and corporate subject to and with the power to act under the authority of all of the provisions of this act. * * * and in addition thereto shall possess the powers hereinafter specifically granted and shall have and possess all the powers granted and applicable to cities of the fourth class not existing ·r operating under a Charter adopted in pursuance of Section 36, Article 4 of the Constitution of the State of Minnesota, or a special charter, and the authorities thereof shall have perpetual succession. * * * And the officers elected or appointed in any village or borough embraced in the territory included in such city shall continue to exercise the powers conferred upon like officers in this state until the officers for the said city shall be elected and qualified."

The information alleges that the village of Nashwauk has existed for some years, that in August, 1921, there were pending proceedings to incorporate the village of Cooley containing lands adjacent to the village of Nashwauk. It is alleged that, while these proceedings were pending, there was instituted a proceeding to incorporate the city of Nashwauk and to embrace within it the land included with the village of Nashwauk, the land included within the proposed village of Cooley, and other lands; that a petition was prepared setting forth the facts required by chapter 462, p. 724, Laws of 1921, purporting to be signed by the proportion of the voters of the district required by said act; that the petition was presented to the judge of probate as required by said act, and that he made an order fixing September 27, 1921, as the time for the election of officers of the city. On September 21 this writ was issued. It is further alleged that the individual respondents were, at the time of the filing of the information and of the issuance of the writ, officers of the village of Nashwauk, and claim to have the right to exercise the

powers conferred by said statute until officers of the city are elected. There is an answer, a reply, a demurrer to a portion of the answer, a proposed rejoinder and a motion to strike out a portion of the reply, and a motion of the respondent for judgment, on the pleadings, that the writ be quashed. The controlling facts are not much in dispute and this motion we think must be granted.

2. The case turns on the question of the constitutionality of chapter 462, p. 724, Laws of 1921.

Relator contends that the statute is unconstitutional as imposing on the judge of probate duties not judicial and not pertaining to the constitutional jurisdiction of the judge of probate. In this particular this statute is in substance the same as chapter 31, p. 56, Laws of 1870, a statute which has never been repealed. The constitutionality of that statute was attacked in State v. Ueland, 30 Minn. 29, 14 N. W. 58. In that case a writ of prohibition was asked to prevent the performance by the judge of probate of the duties imposed by the statute, on the ground that they were judicial duties not within the constitutional power of the judge of probate. The court held that the duties imposed by the statute were not judicial but purely administrative, and that prohibition lies only to prohibit the performance of judicial duties. The question whether the legislature had the constitutional power to invest the judge of probate with these ministerial duties was apparently not raised and was not decided. See Foreman v. Board of Co. Commrs. of Hennepin County, 64 Minn. 371, 67 N. W. 207. In State v. Brill, 100 Minn. 499, 111 N. W. 294, 639, 10 Ann. Cas. 425, it was held that a statute vesting in the judges of the district court the power of appointment of members of the county board of control imposed duties not judicial and which they could not be required to perform. In view of this decision it is difficult to see how this provision of the 1921 statute can be sustained, though under the decision in State v. Brill, supra, it would seem that, if the judge of probate sees fit to act, his acts are not altogether void.

But this is not decisive of the case. The constitutionality of part of a statute does not vitiate the whole statute, if the invalid portion

is separable from the remainder of the act, so that one may operate without the other, and it is not impossible to suppose that the legislature would pass one without the other. State v. Duluth Gas & Water Co. 76 Minn. 96, 105, 78 N. W. 1032, 57 L. R. A. 63.

There is no reason to suppose that the legislature would have made the passage of this law dependant on this particular provision. The provision is a mere detail. We come then to the question whether the remainder of the statute may operate without this provision. We are of the opinion that it may. The statute provides that, "upon presenting the petition to the Judge of Probate as aforesaid, the inhabitants within the metes and bounds therein described shall thenceforth be a body politic and corporate." In other words, the incorporation is complete before any act of the judge of probate is performed. There is the further provision that the officers of the village shall continue to function until the officers of the city shall be elected, and there are ample election laws under which elections may be had. Without the objectionable provision, then, it is apparent that incorporation may be completed and a workable plan of operation may be invoked. This is apart from any suggestion that officers elected pursuant to the voluntary act of the judge of probate may be de facto officers as indicated in State v. Brill, supra.

3. Relator contends that this statute is an unconstitutional delegation of legislative power. The creation of municipalities is a legislative function. State v. Simons, 32 Minn. 540, 21 N. W. 750. The determination of municipal boundaries is a legislative matter.

One contention is that the legislature cannot delegate the power of local legislation to an unorganized body of voters inhabiting an undefined district. In State v. Cooley, 65 Minn. 406, 68 N. W. 66, a statute, providing for the dissolution of a school district whenever two-thirds of the legal voters, voting at a special election called for the purpose of ascertaining their views on the subject, express their opposition to the further continuance of the district, was held constitutional. It was held that the legislature had not delegated any legislative power, that it had simply made the application of the statute conditional and when that condition arises the district is dissolved, not by the voters but by the legislative act itself. The court

quotes Justice Field in People v. Burr, 13 Cal. 343, 358, as saying:

"The legislature may confer a power without desiring to enforce its exercise, and leave the question whether it shall be assumed, to be determined by the electors of a particular district. The legislature may determine absolutely what shall be done, or it may authorize the same thing to be done upon the consent of third parties. It may command, or it may only permit, and in the latter case, as in the former, its acts have the efficacy of laws."

There is probably no serious difficulty arising out of the fact that the determination of the electors is expressed by petition and not by vote.

An Iowa statute provided that, upon petition of a majority of electors of a township, the proper officers should proceed to divide the township. It was held that the petition of a majority of electors was conclusive and the officers were mandamused to divide the township. Henry v. Taylor, 57 Iowa, 72, 10 N. W. 308. See also Perrizo v. Kesler, 93 Mich. 280, 53 N. W. 391.

In an opinion by Justice Brewer, the Kansas court said, in speaking of county-seat elections: "That the vote of a majority is not necessary, nor even the formality of an election. The consent of a majority of the electors in whatever form expressed, whether in election or by petition, or otherwise, is sufficient." County Seat of Linn County, 15 Kan. 500, 530; State v. Burton, 47 Kan. 44, 27 Pac. 141.

In Harrington v. Town of Plainview, 27 Minn 224, 6 N. W. 777, there was involved a statute which assumed to empower a majority of the resident taxpayers of a town, without regard to whether they were electors or not, to bind the town to issue its bonds to aid in the construction of a railroad. The statute provided that, upon presentation of a petition bearing the signatures of a majority of such resident taxpayers, the proper officers of the town should issue the bonds. The officers were given no power to refuse. The act was held unconstitutional, but on the ground that the legislature could not commit such power "to others than the electors of such towns or the officers elected by them." It was said that "under our Con-

stitution the action of the town must be determined by the legis-lature itself, or by those whom the Constitution indicates for such purpose, to-wit, the electors, or the lawful officers elected by them," and that it is "not competent for the legislature to authorize any person or class of persons, other than the electors or the officers chosen by the electors to determine for a town what action requir-ing local taxation it will take in a particular case."

The decision was in no measure predicated upon the fact that the action of the town was to be taken by petition and not by vote at an election. The inference from the decision is that the court regarded the form of procedure as constitutional, for the court refers to de-cisions in New York and Vermont in which similar laws were sus-tained, and where it was held that there was no constitutional in-hibition on this restriction of voting power and our court said [27 Minn. 233]: "Thus construing their constitutions, it followed neces-sarily, that the legislature might provide for the taxpayers, whether electors or not, expressing the consent and determining the action of the town." We have gone into these decisions rather fully, because they state well the applicable principles.

4. It is contended that the legislature has not determined the conditions which fix the amount of territory which may be included in the proposed city, that it has delegated the power to prescribe the conditions which when met define the boundary, and in fact that the act makes no restriction, but that any territory however large and however populated may organize as a city. We think this contention is disposed of by State v. Minnetonka Village, 57 Minn. 526, 59 N. W. 972, 25 L. R. A. 755. The statute considered in that case was one providing for the incorporation of villages and it provided that "any district, sections or parts of sections which has been platted into lots and blocks, also the lands adjacent there-to * * * said territory containing a resident population of not less than 175, may become incorporated as a village." The point there made against the validity of the act was that the statute "neither itself determined how much or what character of land shall be included in a village, nor delegated the power to do so to any proper subordinate official body." The court held that the purpose

of the act was to authorize the incorporation of "villages" in the ordinary and popular sense; that "lands adjacent thereto" included only those which lie so near the center or nucleus of population as to be somewhat urban in their character, and to have some community of interest in the maintenance of a village government; that it did not authorize the incorporation of large tracts of rural territory having no natural connection with any village and no adaptability to village purposes. As so construed the act was sustained. The incorporation of the village was not sustained, although the territory was in fact contiguous, on the ground that most of the territory, essentially rural, had no fitness for village government and no community of interest in respect to the purposes for which such a government is designed. A similar construction must be placed on the statute here in question, and so construed we are of the opinion that the statute is constitutional. We have so construed the statute relating to the incorporation of villages. State v. Village of Buhl, 150 Minn. 203, 184 N. W. 850.

It is argued that the law does not authorize the inclusion of more than one village within the limits of a proposed city. Whether it does or not we need not determine. The incorporation of the city was completed by the filing of the petition on August 25, 1921. At that time the incorporation of the village of Cooley was not complete.

5. Relator contends that the act of 1921 is unconstitutional in that it provides for a classification of cities on a basis of population narrower than that prescribed in the Constitution. Article 4, § 33, of the Constitution creates the fourth class composed of cities of 10,000 inhabitants or less. This statute relates to villages having not less than 1,000 and not more than 10,000 inhabitants. The fact is that this minimum requirement of population for this form of incorporation has been on our statute books since 1870 (chapter 31, p. 56, Laws 1870), and it is still there regardless of the provision of the act of 1921. Under these conditions it seems to us this restriction is not fatal to the law. We do not understand that it is contended that article 4, § 33, of the Constitution has repealed the act of 1870.

6. A more difficult question is raised by the next contention that this statute grants powers on the basis of this particular method of incorporation.

The act of 1921 provides that cities incorporated under it shall possess all the powers granted and applicable to cities of the fourth class not operating under a home rule charter or a special charter and also that they "shall possess the powers hereinafter specifically granted." [Section 2.] Some powers are "specifically granted" in the act which are different from those possessed by cities of the fourth class. For example, there is a difference in the limit of tax levy and of indebtedness. We are impressed with the idea that these points of difference relate to matters of detail not vital to the main purposes of the act. If they should fail the whole act would not fail. Lodoen v. City of Warren, 146 Minn. 181, 178 N. W. 741. We do not pass on the validity of all provisions of the act.

The motion of the respondent for judgment on the pleadings is granted and the writ is quashed.

On July 21, 1922, after reargument, the following opinions were filed:

DIBELL, J.

Original proceedings in quo warranto on the relation of the attorney general to test the validity of the incorporation of the city of Nashwauk in Itasca county. The incorporation of the city is under Laws 1921, p. 724, c. 462, and was completed August 25, 1921. This statute provides that when two-thirds of the legal voters in a contiguous territory having not less than 1,000 nor more than 10,000 inhabitants shall sign and present to the judge of probate of the county the required petition they shall become a body corporate. Nothing more is required. A territory may be incorporated into a city between morning and evening. The city of Nashwauk was incorporated within two days, or perhaps it was three. The constitutional validity of the statute was sustained on a former hearing in this proceeding. On that hearing it was held that territory incorporated under the 1921 statute must have the urban character re-

quired for the incorporation of villages or the annexation of terri-
tory under various statutes, and State v. Minnetonka Village, 57
Minn. 526, 59 N. W. 972, and State v. Village of Buhl, 150 Minn. 203,
184 N. W. 850, were cited as applicable. We have now for consid-
eration whether the territory incorporated is of an urban character
and properly conditioned as a whole for municipal government as a
city.

In the Minnetonka case Justice Mitchell said [57 Minn. 533]:

"The purpose evidently was to authorize the incorporation of
'villages,' in the ordinary and popular sense, and not to clothe large
rural districts with extended municipal powers, or subject them to
special municipal taxation for purposes for which they were wholly
unsuited. A 'village' means an assemblage of houses, less than a
town or city, but nevertheless urban or semiurban in its character.
*   *   *   The law evidently contemplates, as a fundamental condi-
tion to a village organization, a compact center or nucleus of pop-
ulation on platted lands.   *   *   *   It was never designed that re-
mote territory, having no natural connection with the village, and no
adaptability to village purposes, should be included."

In State v. Village of Alice, 112 Minn. 330, 127 N. W. 1118, Chief
Justice Start, citing the Minnetonka case, stated the test of urban
character as follows [page 332]:

"Whether the adjacent territory may be properly subjected to
village government is not to be determined by the pecuniary interests
of the owners thereof; but their land cannot arbitrarily be brought
into the village simply for the purpose of increasing its revenues by
taxing it. The adjacent lands must be so near to the center of the
platted lands as to be somewhat suburban in their character. The
final test is whether the platted territory and the adjacent territory
are so limited in area and have such a natural connection, and the
people residing thereon have such a community of interest, that the
whole may be properly subjected to village government."

The principles of these cases were applied in State v. Village of
Gilbert, 127 Minn. 452, 149 N. W. 951, and State v. Village of Kin-

ney, 146 Minn. 311, 178 N. W. 815; and in State v. Village of Buhl, 150 Minn. 203, 184 N. W. 850, it was said that "annexed territory ought of right to have some advantages for the increased taxes it pays," and that an annexation would not be sustained when the purpose was "to annex sources of revenue rather than territory subject to village government."

We have recognized that there is a difference between a village in a mining country and a village in an agricultural community; and that the question whether territory is so situate as properly to be subject to village government is primarily a legislative one for the voters, to whose determination the court defers, but subject nevertheless to the conditions under which incorporation is authorized by the legislature. State v. Village of Alice, 112 Minn. 330, 127 N. W. 1118; State v. Village of Dover, 113 Minn. 452, 130 N. W. 74, 539; State v. Village of Gilbert, 127 Minn. 452, 149 N. W. 951; State v. Village of Kinney, 146 Minn. 311, 178 N. W. 815; State v. Village of Buhl, 150 Minn. 203, 184 N. W. 850.

With these considerations in mind we take a look at the territory incorporated as the city of Nashwauk. Its north and south lines projected are $4\frac{1}{2}$ miles apart at right angles; its east and west lines $4\frac{3}{4}$ miles. From northeast to southwest it is about $6\frac{1}{2}$ miles. Its area is $9\frac{1}{2}$ sections. It includes Nashwauk village which was incorporated 20 years ago. The village includes sections 29, 30, 31 and 32 in township 57, range 22, a compact tract 2 miles square. The plat now covers the east 80 of the S. W. $\frac{1}{4}$ of 32 and the 40 to the north, the southern 40 having been platted recently. The village has a population of 2,500, the number varying some with the activity of the mines upon which the village is mostly dependent. The village has several paved streets, other graded ones, cement sidewalks, electric lights, a public water and sewage system, a village hall costing $35,000, three churches, a three story brick hotel, two banks, the usual business houses found in villages of such size, and located within the platted portion is a graded and a high school together costing $800,000. The houses have water and sewer connections and are modern, or at least many of them are, and quite generally the mine workers are home owners. Within the village limits are 7 or

8 working mines, located in general to the north and west of the platted land. About them are clustered the homes of some of the workers. The living conditions there are not so good as in the platted portion. The village is the typical prosperous and progressive range village of some years' development, of ample limits, not congested nor, so far as can now be judged, of assured very great immediate growth, well improved and comfortable, and having many of the conveniences not usual in villages relying for support upon a surrounding agricultural country, and lacking some advantages which such villages have.

Section 28 just east of 29 is included in the city. Nothing is upon it and it has no inhabitant. To the south and west territory aggregating 4½ sections is added. In this portion of the added territory are 3 working mines, the Patrick, the Kevin and the Harrison. There are 3 so-called locations where miners live. They are not inviting. The housing conditions are not good. The tendency is towards betterment. The territory though occupied for a number of years is still in the making. The population is to some extent floating and aggregates about 300. On only a small fraction of the forties making the 4½ sections are there residents. The nearest of the mining locations at the southwest is 1½ miles from the platted portion of the village and the farthest is 2¾ miles, and some of the territory included and mining operations conducted are much farther.

In this territory are concentrators or wash plants, and the accompanying sludge basins, and the dumps common to open pit mining. The country is rough and broken or swampy. Originally it was timbered. There is a second growth. In the vicinity of the Kevin location wild animals, deer, coyote, brush wolves and mink still maintain their native habitat, and some trapping is done. There is a general store at the Harrison location. The residents trade there and at Nashwauk and other places. There is no postoffice. Residents get their mail and take trains at Nashwauk on the Great Northern, or at Pengilly on the Missabe, 1¼ miles from the southern boundary of the city. The southwest territory is substantially set off from Nashwauk property by open pits and dumps, except as the Babcock highway goes through by a viaduct as does the Great North-

ern railroad. Some few of the residents of the village work indifferently at the mines in the village or those to the southwest, and to some extent mining operations are conducted across the boundary line partly in the old village and partly in the new territory.

The assessed valuation of the property within the limits of the village is $1,557,000. The assessed value of the territory outside of the limits of the village is $886,000. The total valuation of the city is $2,443,000. Section 28, the section without an inhabitant, has a valuation of $100,000. Taxable values in the village territory are not increasing—rather decreasing. The village levy for 1920 was $73,960. This did not include school or other taxes.

These figures suggest a use of so large a territory by the new municipality for "special municipal taxation," as said in the Minnetonka case; or "for the purpose of increasing its revenues by taxing it," as said in the Alice case; or, as said in the Buhl case, for the annexation of "sources of revenue rather than territory properly subject to village government." The testimony leaves no doubt of the actual purpose. The witnesses, residents of the village, quoting their own language or language which they directly affirm, say that "iron ore" determined the boundaries; that they "wanted to tax it"; that lands were included "for the valuation;" that they "wanted the taxes;" that they were "after ore valuations;" that section 28 was included because they "knew iron had been found there;" that by preventing the incorporation of a village to the southwest they would get "higher tax valuations;" that ore bodies "had lots to do with fixing the boundaries," and "that was mostly it, I guess;" that the S. W. ¼ of S. W. ¼ of 2-56-23, the 40 jutting farthest into the territory to the west, having no inhabitant, was included because it was "understood there were mines on there"; that they "included section 28 for the same reason;" that it would "help the village out financially to increase the assessable value of the property;" that it would "give more valuation;" that they would "get more assessable valuation for taxes;" and that the purpose was "that Nashwauk would get more taxes."

The village had a net debt of $127,000, expenses were large, taxable property in the village was not increasing, and the people want-

ed more valuation because they wanted more revenue. The Nashwauk people from their own practical standpoint looked upon the proceeding as none other than one for annexation. They did not distinguish. The annexation statute (G. S. 1913, § 1800, et seq.) under which the Buhl case arose, might have been used, except that it did not permit the annexation of territory more than 1½ miles beyond the village limits. Besides, under that statute, the voters of the annexed territory had the right to determine at an election whether they wanted annexation. The people of the southwest territory wanted a village center of their own. The petition was circulated in the village and not outside it. The annexation statute gave the residents of the annexed territory the sole right to determine their local government. The Nashwauk people were moved by self interest and wanted the additional territory, and so were the residents to the southwest who wanted to be apart from Nashwauk with a village center of their own.

There was a proceeding pending to establish in the southwest territory a village under the name of Cooley, at the so-called midway location on the Babcock highway, when the petition for the incorporation of the city was filed. The immediate occasion of organizing the city was to "forestall," as the witnesses say, "this movement." It succeeded. To incorporate the village a notice and election were necessary. Such a proceeding could not compete for quick results with a proceeding by petition without notice or election. An election was held and 48 voted for incorporation and 7 voted against it. The boundaries of the village were nearly identical with the territory to the southwest included in the city. The respondents emphasize the fact that it was then claimed that this territory was urban in character and that if so then it is now. We attach no importance to this claim. On the former hearing it was held that there was no estoppel against the state because of the facts stated, though the southwest territory was substantially under a single ownership. If the 4½ sections were urban it would not follow that the 11½ sections were properly conditioned for a single municipal government. It may be that the territory to the southwest, or some part of it, has such a community or unity of interest and such a nucleus of popula-

tion that it is properly conditioned for village government; and that with a civic center established stores and a bank and churches contributing to the convenience and welfare of the community would be attracted, in a way as they have come to Nashwauk village, and that the school district would furnish school facilities near the homes of the residents. This would mean local government and not subjection to a localized government centered some miles away. In any event, as held on the former hearing, there is no estoppel, and these questions are not here.

A difference between villages in mining communities and in agricultural communities and the character of the dependence of one upon another is noted in State v. Village of Gilbert, 127 Minn. 452, 149 N. W. 951, and other cases before cited. There is no claim that mine owners may rightfully object to a municipality including their land upon the ground that their taxes will be increased. Mines require workers and may make necessary municipal conveniences. The presence of mines may indeed suggest the propriety of their inclusion in the village where the workers live so that the local community may be properly policed, subjected to proper sanitation, and have the conveniences of life which only a local government can give. In Sartell v. County of Benton, 149 Minn. 233, 183 N. W. 148, we suggested the justice, without formulating a legal proposition, of an industry which brings in a community of workers, dependent upon it and doing its work, contributing to the support of the schools made necessary. Granting all this, the case of the respondents is not helped. The nearby tax values, rather than appropriate municipal government, suggest the reason of a city of so inclusive limits.

The organization of municipalities is legislative in character and primarily for the voters to whose views courts somewhat defer. It is not, however, a matter of unrestricted legislative discretion resting with the voters. It is a fundamental requirement that the territory incorporated be so conditioned as to be subjected properly to municipal government. State v. Village of Buhl, 150 Minn. 203, 184 N. W. 850, and cases cited. When this question is presented it is for the court to speak. Often it has spoken adversely. State v. Minne-

tonka Village, 57 Minn. 526, 59 N. W. 972; State v. Village of Fridley Park, 61 Minn. 146, 63 N. W. 613; State v. Village of Holloway, 90 Minn. 271, 96 N. W. 40; State v. Village of Gilbert, 107 Minn. 364, 120 N. W. 528; State v. Village of Buhl, 150 Minn. 203, 184 N. W. 850.

We hold that there is no such community or unity of interest between the people in section 28 to the northeast, the people in the village limits, and the people in the territory to the southwest, nor such a natural connection between the lands sought to be brought into one municipality, as justifies incorporating the 11½ sections as a city, and that the territory taken as a whole is not so conditioned as properly to be subjected to municipal government.

Let a writ of ouster issue.

HALLAM, J., dissenting (Chief Justice Brown, concurring in dissent.)

I dissent. In my opinion the incorporation of the city of Nashwauk should be allowed to stand. We must keep well in mind the difference between mining and agricultural communities. Most of the added territory was under one ownership. It has been treated as a unit. It was all acquired for mining development. Four mines are operated upon it. These all mean settlements. As ore may be discovered and new mines opened it becomes necessary to shift houses and settlements. The location of the population is shifting. The operation of mines in a community gives rise to policing problems over large areas. The operation of mines locates groups of inhabitants, employes and others, in the vicinity, yet some distance away. It is to be expected that the mine itself though uninhabited must bear some of the burden of the municipal government that the incidental population requires.

The inhabitants of the added lands realized these facts and when they prepared to incorporate the village of Cooley, they embraced within it more than 4 square miles of this land though the population was about 300, and though the land included embraced some of the most uninhabitable of the land incorporated in the city of Nashwauk, and practically all of the property owners, taxpayers, voters and inhabitants of that territory were in favor of village government for the territory.

Of course the conduct of the inhabitants of the Cooley territory does not operate as an estoppel. This is a proceeding between the state and the city of Nashwauk. Yet the views of those directly concerned as to the propriety of inclusion of any given territory within village or city limits is of much moment. State v. Village of Dover, 113 Minn. 452, 130 N. W. 74, 539; State v. Village of Kinney, 146 Minn. 311, 178 N. W. 815. And the further fact remains that the only persons manifesting any keen interest in this controversy are the inhabitants of the Cooley territory on the one hand and of the old village of Nashwauk on the other. The Nashwauk population is as nearly unanimous for the inclusion of these lands into its city as the Cooley population is for their inclusion as a separate village. Both are virtually unanimous for one form or the other of municipal government for at least the whole Cooley territory.

Courts should not be too exacting in requiring that lands within the limits of a city be presently subjected to urban uses. It is well known that there are many creditable cities in the state that could not pass too rigid a test. The capital city of the state has for more than 35 years had an area of approximately 55 square miles. Much of it is still agricultural, grazing and timbered land. It has common farms, dairy farms, and even large tracts of unoccupied lands. It is matter of history that in 1885 more than 30 square miles were added at one time with only a few little clumps of inhabitants on the whole tract, and there was already within the city limits much land unoccupied except for agricultural purposes. There were single farms covering a whole square mile. There was virgin forest not even cut over. There were fair grounds, private race courses and large preserves for private country clubs. Its fauna did not rival that of the Nashwauk country but there were well-known hunting grounds. And some of the increase of area was made to "forestall" a rival. It probably could not have stood the test now applied, unless by reason of the fact that there was a special act of the legislature, yet no one ever thought it a case for challenge by proceedings in the nature of quo warranto or otherwise. I am opposed to a writ of ouster in this case. I am authorized to say that the Chief Justice concurs in this dissent.