## STATE EX REL. UNIVERSITY OF MINNESOTA AND OTHERS v. RAY P. CHASE.[1]

July 27, 1928.

No. 26,800.

**State organization act of 1925 construed.**

1. L. 1925, c. 426, the act "in relation to the organization of the state government," construed to include the state university as one of the agencies of state government intended to be subjected to the control of the governor through the Commission of Administration and Finance. That the university is a body corporate with a large degree of independence does not prevent its being considered, from the standpoint of functions and purposes, an instrument or agency of the state to accomplish the governmental end of higher education.

**Board of Regents of state university independent of other executive authority.**

2. The Board of Regents was incorporated by the territorial assembly (L. 1851, c. 3) with the right to "govern" the university. By

[1]Reported in 220 N. W. 951.

the state constitution (art. 8, § 4) all the "rights, immunities, franchises and endowments" so granted were "perpetuated unto" the university. Accordingly, the Board of Regents, in .the management of the university, is constitutionally independent of all other executive authority; and in so far as L. 1925, c. 426, attempts to subject the control of university finances to the supervision of the Commission of Administration and Finance it is unconstitutional.

**Legislature may not place power over university affairs elsewhere.**

3. The distinction between the function of the legislature and that of the regents, in respect to the university, is that between legislative and executive power. *All* the executive power over university affairs having been put in the regents by the constitution, none of it may lawfully be exercised or placed elsewhere by the legislature.

**When adverse practical construction of constitution is disregarded.**

4. That result *held* so plainly a necessary consequence of the constitutional confirmation of the independent power of the Board of Regents that an adverse practical construction is disregarded. In construing a constitutional provision resort must first be had to its letter and spirit in their application to the subject matter. If the meaning is plain, without going farther, it is not permissible to adopt any different practical construction, however well established it may be.

Colleges and Universities, 11 C. J. p. 976 n. 22; p. 977 n. 29.
Constitutional Law, 12 C. J. p. 702 n. 81; p. 716 n. 94; p. 748 n. 9; p. 835 n. 10.

The state auditor, Ray P. Chase, appealed from a judgment of mandamus of the district court for Ramsey county, Hanft, J. commanding him to approve and issue his warrant in payment of an item of expense incurred by respondent Board of Regents of the University of Minnesota. Affirmed.

*G. A. Youngquist,* Attorney General, and *Charles E. Phillips,* Assistant Attorney General, for appellant.

*Charles W. Bunn* and *Everett Fraser,* for respondents.

STONE, J.

Mandamus on behalf of the University of Minnesota and its Board of Regents to require Ray P. Chase, State Auditor, to approve a

voucher and issue his warrant in payment of an item of expense incurred by the regents in a preliminary survey for the purpose of installing a plan of group insurance of members of the faculty and other permanent employes of the university. On the ground of policy alone, that purpose encountered the disapproval of the Commission of Administration and Finance; hence the adverse action of the auditor. Judgment went against him, and he appeals.

On the surface of things, the contest is between the Board of Regents and the Commission of Administration and Finance, hereinafter mentioned only as the commission. But the real issue is between the regents and the governor, made for them by L. 1925, p. 756, c. 426, "An act in relation to the organization of the state government." The purpose of the law is to centralize administrative responsibility in the governor. He appoints the commission with the advice and consent of the senate. But by art. III, § 15, of the act all orders and rulings of the commission are subject to review by him; and it is provided in art. III, § 2, that he may remove any member of the commission at any time without cause.

The commission, with entire candor, "claims authority to supervise and control the expenditure of any and all moneys" by or for the university; "the making of all contracts" by the several officers, departments, and agencies of the state government, including the university and the Board of Regents; and that the latter cannot lawfully expend any money, from whatever source derived, for university support and administration "for any purpose or object which has been disapproved" by the commission or incur financial obligation for such purpose or object. The right so to control university finances is the power to dictate academic policy and direct every institutional activity. So, in sum, the claim for appellant is that the act of 1925 has subordinated the Board of Regents to the commission and has made the latter, under the governor, the final arbiter of all university affairs. The policy of such a law, whether it grants the autocratic power frankly claimed by the commission, or whether (as argued but not now considered) it extends beyond constitutional limits the veto power over appropriations, is not for us.

1. Our first problem is whether the commission's position is tenable as a matter of statutory construction. Art. I of the law establishes specified "departments and agencies of the state government." Neither the university nor the Board of Regents is among those thereby established. But the article concludes with this sweeping sentence: "All of said departments and all officials and agencies of the state government shall be subject to * * * this act." The railroad and warehouse commission, although not one of the departments created by this act, is expressly subject thereto as an agency of state government. State ex rel. Yapp v. Chase, 165 Minn. 268, 206 N. W. 396. If the university is such an agency, the power claimed by the commission is plainly within the law. Art. III, § 3, confers power "to supervise and control" expenditures by all "departments, and agencies of the state government and of the institutions under their control; the making of all contracts and the creation or incurrence of all financial or contractual obligations; * * * by or for the state or any such department, agency, or institution." By § 5 of the same article, no appropriation to any "official, department, or agency of the state government or to any institution under its control" can become "available for expenditure" without the submission to the commission of an "estimate" and its approval of the same. The obvious intention is to include everything in the way of department or institution used as a means to any end of state government. Education being one of those ends and the university the premier of the state's educational system, it is, in the ordinary and functional sense, plainly an agency of the state. Beyond that, we find stated exceptions from the law's operation, neither the university nor the Board of Regents being among them. Art. XVII declares that the act shall not apply to the state agricultural society, and art. III, § 6, that it shall not reach certain functions of the board of control. Certainly, while these exceptions were being created and stated, the university would also have been expressly excepted, if such had been the intention.

That the university is a state institution, in the legal as well as the colloquial sense, admits of no doubt. In Regents v. Hart, 7 Minn. 45, 49 (61), it was said that the Board of Regents is a

public corporation, a "trustee or agent" of the state with "specified and limited powers" for use in a "particular manner for a given end." That language was construed in State ex rel. Smith v. Van Reed, 125 Minn. 194, 198, 145 N. W. 967, as recognizing the university to be a "public institution * * * merely an agency of the state to exercise certain limited and specified powers." The dictum of Gleason v. University of Minnesota, 104 Minn. 359, 362, 116 N. W. 650, that the university could not be relegated to the position "of a mere agency of the state," has to do only with the independent status of the Board of Regents. It does not imply that the institution is not a mere instrumentality or agency of government in a functional sense. In that view, the government itself is but an agency of the state, distinguished as it must be in accurate thought from its scheme and machinery of government. Grunert v. Spalding, 104 Wis. 193, 212, 78 N. W. 606, 613, 80 N. W. 589. The term "government" itself, in its derivation from the Latin "gubernaculum," signifies the instrument, the helm, whereby the ship, to which the state was compared, was guided on its course by the "gubernator" or helmsman. 2 Bouvier, Law Dic. (Rawle's 3 Rev.) 1366.

"Words in a constitution, as well as words in a statute, are always to be given the meaning they have in common use, unless there are very strong reasons to the contrary." Tennessee v. Whitworth, 117 U. S. 139, 147, 6 S. Ct. 649, 29 L. ed. 833, 835. There being nothing in the act of 1925 to show that its controlling terms were used in other than their ordinary sense, and inasmuch as in that sense they include the university, we conclude that to have been the intention of the law. That is confirmed by the report of the interim committee of the house of representatives upon the then proposed "reorganization of state government," submitted to the legislative session of 1925. Chapter 426 was its result. The regents were listed as one of the "appointive state administrative boards" and again among the "boards consisting of unsalaried members." Having first included it as a state institution, gentlemen of the ability and purposes possessed by the authors of the measure would

not finally have entertained an intention to omit the university without saying so. Their plan did not lack ambition. It did not suggest the express exceptions already referred to. They seem to have come from the legislature itself. And the thought recurs that members of that body would not have mentioned the exceptions they did without explicitly excluding the university also if that had been their purpose. That the university is a body corporate, with a degree of independence to be discussed later, in no way obstructs the conclusion that it is an agency of government to accomplish a state purpose, just as a municipal corporation, however independent it may be under its charter, is an agency of government for the accomplishment of local purposes. See annotation, 29 L. R. A. 378.

2. So we must determine whether under the constitutional provision about to be considered the legislature may deprive the regents of the whole or any part of the management of the university. Its original charter was Laws of the Territory for 1851, p. 9, c. 3. The title, "An Act to incorporate the University of Minnesota, at the Falls of St. Anthony," shows that the central purpose was to create a corporation. Section 4 declared that "the *government* of this University shall be vested in a Board of twelve. Regents" to be elected by the legislature. The first board was divided into three classes, four regents in each, their terms of office respectively two, four and six years. "Biennially," § 5 proceeds, "thereafter there shall be elected in Joint Convention of both branches of the Legislature, four members to supply the vacancies made by the provisions of this section, and who shall hold their offices for six years respectively." Section 7 provides that "the Regents of the University and their successors in office, shall constitute a body corporate, with the name and style of the 'Regents of the University of Minnesota,' with the right as such, of suing and being sued, of contracting and being contracted with, of making and using a common seal." Section 9 gave the regents power and made it their duty "to enact laws for the *government* of the University" and provided for their appointment of professors, tutors and officers of the institution.

Section 20 reserved to the legislative assembly the right at any time to alter, amend, or repeal the act.

So the regents were made a "body corporate" with power to *govern*. That is the power to control. 4 Wd. & Phr. (1 ser.) 3139. As applied to corporations, it is the power of management. The university continued under the act of 1851 until the coming of statehood in 1858. Art. 8, § 4, of the constitution then adopted, after confirming its location "as established by existing laws," proceeded: "and said institution is hereby declared to be the 'University of the State of Minnesota.' All the rights, immunities, franchises and endowments heretofore granted or conferred are hereby *perpetuated* unto the said university; and all lands which may be granted hereafter by Congress, or other donations for said university purposes, shall vest in the institution referred to in this section."

That a corporation was created by the act of 1851 and "perpetuated" by the constitution with "all the rights, immunities, franchises and endowments" which it then possessed is plain. Of that corporation the regents were both the sole members and the governing board. They were the corporation in which were perpetuated the things covered by the constitutional confirmation. The language has a definite legal import; the terms are those of confirmation in perpetuity of a prior grant of corporate rights. So the university, in respect to its corporate status and government, was put beyond the power of the legislature by paramount law, the right to amend or repeal which exists only in the people themselves. The result was a "constitutional corporation," said to be the "highest form of juristic person known to the law," Board of Regents v. Auditor General, 167 Mich. 444, 450, 132 N. W. 1037, a dictum which ignores the fact that the state itself is a "political corporate body." 7 Wd. & Phr. (1 ser.) 6628, 6629.

The ingenious argument contra is that the things "perpetuated" were confirmed to the university as a mere "institution" and not as a corporation. What is so meant by "institution" is not altogether clear. But it is enough that the intention is to exclude the corporation as a legal entity. Yet the body corporate was the

only "institution" legally or intrinsically capable of being the grantee of the "rights, immunities, franchises and endowments," and so the only holder in which they could be confirmed in perpetuity or at all. Such grants of sovereign rights are not made to any "institution" in the sense of a combination of campus, buildings, faculty and students, possible only as a sentimental hypothesis. They can go to an institution only in the sense that it is a corporate, legal entity and so endowed with capacity to take the grant and accomplish its purpose. The original grant was not and could not have been to any "institution" other than the corporation. There- fore it could not have been confirmed in any other "institution."

The foregoing receives the definite confirmation of context. Art. 8, § 4, of the constitution concludes to the effect that all lands or other donations for university purposes should vest in the "institution referred to in this section." They could vest in the institution only in the sense that it was a corporation. So, all else aside, the corporation must have been the holder referred to in the next preceding provision perpetuating things theretofore granted. "The institution, as distinguished from the corporation, has no being, and is incapable of owning property." County of Nobles v. Hamline University, 46 Minn. 316, 48 N. W. 1119.

The constitution added nothing to the quantity of the grant but did add the new quality of perpetuity. The grant was not merely confirmed—it was "perpetuated." So we find the people of the state, speaking through their constitution, have invested the regents with a power of management of which no legislature may deprive them. That is not saying that they are the rulers of an independent province or beyond the lawmaking power of the legislature. But it does mean that the whole executive power of the university having been put in the regents by the people, no part of it can be exercised or put elsewhere by the legislature. In consequence, so far as L. 1925, p. 756, c. 426, attempts to give the commission any power of supervision or control over university finances, it is in violation of art. 8, § 4, of the state constitution and therefore inoperative. It follows that the commission had no concern with the proposed

expenditure of university funds, their veto of which caused the auditor to refuse payment of the item now in question, and that mandamus was properly allowed to compel the payment.

3.    Generally, the distinction between the jurisdiction of the legislature and that of the regents is that between legislative and executive power.    "Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement." Springer v. Philippine Islands, —— U. S. ——, 48 S. Ct. 480, 482, 72 L. ed. 522, 525.    But, as was said by Mr. Justice Holmes in his dissent in that case [——U. S.——, 48 S. Ct. 485, 72 L. ed. 528, 529] :

"The great ordinances of the Constitution do not establish and divide fields of black and white.    Even the more specific of them are found to terminate in a penumbra shading gradually from one extreme to the other.    *    *    *    We do not and cannot carry out the distinction between legislative and executive action with mathematical precision and divide the branches into watertight compartments, were it ever so desirable to do so."

It has taken 70 years to raise this first issue of power between regents and legislature.    That makes safe the assumption (very comforting to the characteristic judicial aversion to issues between departments or officers of government) that, with this broad indication of their respective fields of power, their mutual regard for each other's constitutional provinces will make unnecessary any further judicial attempt to mark the precise line dividing their respective jurisdictions.    It is characteristic of our government that all its officers, "from the highest to the lowest, are equally subjected to legal restraint."    Ex parte Gilchrist v. Collector, 5 Hughes, 1, 4.    And notwithstanding the tendency of power in human hands to expand itself, there has been on the part of officialdom in the United States a high regard for the limits of proper departmental action.    The transgressions have been in the main inadvertent and largely in fields theretofore untrod by official action where the line had not been blazed by experience or mapped by studied consideration.    Once they recognize even the general location of

their limits, legislature and executive are alike careful not to come even near an encroachment on each other's domain. And if one takes place, it is likely to be suffered in silence in order to avoid open conflict. Especially is that so when the usurper is the legislative power. The executive is ordinarily too dependent upon the legislature for appropriations, and too desirous of generosity therein, to risk the disfavor of the money distributors by resisting their invasions of executive domain. In consequence, the executive policy of nonresistance may be patient and endure much—as will appear from the legislative history of the university soon to be narrated briefly.

Fortunately for us, this case does not require the boundary to be run between the province of the general lawmaking power of the legislature and that of the special managerial function of the regents in respect to the university. It is enough to hold, as we do, without going farther, that the legislature cannot transfer any of their constitutionally confirmed power from the regents to any other board, commission, or officer whatsoever. Their appointment by the territorial legislature as sole members and directors of the university corporation was confirmed by the constitution. That put them in a position somewhat analogous to that of the governing board of the ordinary corporation. In the absence of special rule contra, "all authority in respect to the business of the corporation is lodged in the board of directors." 2 Thompson, Corp. (3 ed.) § 1278. The people were the "corporators of this institution of learning" and "by their Constitution, conferred the entire control and management of its affairs and property" upon the Board of Regents. Weinberg v. Regents, 97 Mich. 246, 254, 56 N. W. 605. *All* that power having been put in the regents, none of it remained to be exercised by any other body—not even the legislature itself. At the one extreme, the legislature has no power to make effective, in the form of law, a mere direction of academic policy or administration. At the other extreme it has the undoubted right within reason to condition appropriations as it sees fit. "In such case the regents may accept or reject such appropriation, * * *. If they accept, the conditions are binding upon them." Board of

Regents v. Auditor General, 167 Mich. 444, 451, 132 N. W. 1037, 1041.

Oklahoma, Idaho, and Michigan have each had a similar problem. The constitution of Oklahoma [art. VI, § 31] made the board of agriculture ex officio the board of regents of all state agricultural and mechanical colleges. That provision vested in the board the powers exercised by a similar board at the time the constitution was adopted. So it was beyond the constitutional power of the legislature to confer upon another board the authority to contract for and erect buildings for the state agricultural and mechanical college. Trapp, State Auditor, v. Cook Const. Co. 24 Okl. 850, 105 P. 667. The constitution of Idaho [art. IX, § 10] like that of Minnesota, "perpetuated" unto the state university "all the rights, immunities, franchises, and endowments" theretofore granted and gave the regents the general supervision and control of the affairs of the university and the expenditure of its funds "under such regulations as may be prescribed by law." Accordingly, it was held in State ex rel. Black v. State Board of Education, 33 Idaho, 415, 196 P. 201, that the university was a constitutional corporation of independent authority and, within the scope of its functions, co-ordinate and equal with the legislature. Therefore a claim against the university was not a claim against the state, and its payment could not be made subject to approval by a state board of examiners functioning independently of the board of regents.

The University of Michigan is the beneficiary of a similar grant of independent power. For a long time the regents resisted the will of the legislature that instruction in homeopathic medicine be given in the medical department of the institution. People ex rel. Regents v. Auditor-General, 17 Mich. 160; People v. Regents, 18 Mich. 468; People ex rel. Attorney General v. Regents, 30 Mich. 473. Weinberg v. Regents, 97 Mich. 246, 253, 56 N. W. 605, holds that the control of the university is in the regents to the exclusion of other state departments, under a constitutional provision that "the Board of Regents shall have the general supervision of the University, and the direction and control of all expenditures from

the University interest fund." In Sterling v. Regents, 110 Mich. 369, 379, 68 N. W. 253, 34 L. R. A. 150, the attempt was made to compel the regents to remove the homeopathic college from Ann Arbor to Detroit. It was unsuccessful because an attempt by the legislature to interfere with the power of the regents. The question and its history were gone into elaborately. The grant to the regents of the power of management was explained upon the theory that, even as early as 1850, when the constitution in question had been adopted, it had become "obvious to every intelligent and reflecting mind that such an institution would be safer and more certain of permanent success in the control of such a body" with relatively long terms and a slowly changing personnel than in numerous legislatures, elected every two years, "many of whom would, of necessity, know but little of its needs, and would have little or no time to intelligently investigate and determine the policy essential for the success of a great university." Board of Regents v. Auditor General, 167 Mich. 444, 452, 132 N. W. 1037, holds that, because of the constitutional independence of the regents, the auditor general can exercise no judicial functions as against their discretion "in expenditure of the University funds." A similar issue with a like solution arose with respect to the status of the Michigan Board of Agriculture. State Board of Agriculture v. Auditor General, 180 Mich. 349, 147 N. W. 529; State Board of Agriculture v. Auditor General, 226 Mich. 417, 197 N. W. 160. See also State ex rel. Medical College of Alabama v. Sowell, 143 Ala. 494, 500, 39 So. 246, holding that the state had no control over a public corporation "the entire control and management" of which had been committed to a self-perpetuating board of trustees.

The principle of our decision of this case, as well as of those we have just cited, is that which attends every constitutional grant of power to any official or department of government. "A constitution being the paramount law of a state, designed to separate the powers of government and to define their extent and limit their exercise by the several departments, * * * no other instrument is of equal significance. * * * when the people have

declared by it that certain powers shall be possessed and duties performed by a particular officer or department, their exercise and discharge by any other officer or department, are forbidden by a necessary and unavoidable implication. Every positive delegation of power to one officer or department implies a negation of its exercise by any other officer, department or person. If it did not, the whole constitutional fabric might be undermined and destroyed." State ex rel. Crawford v. Hastings, 10 Wis. 468, 475.

4. The argument of practical construction, opposed to this decision, has so much factual basis that it deserves special attention. It is true, as urged by the attorney general, that the legislature, beginning as early as 1860, has taken all manner of liberties with university management and that such invasions of their prerogatives have not been resisted by the regents. It is complimentary to both that there has been little if any resulting friction or retardation of university progress.

By L. 1860, p. 264, c. 80, the legislature reorganized the university and purported to repeal expressly, notwithstanding its constitutional confirmation, L. 1851, p. 9, c. 3. That repeal being necessary to the operation of the new law but unconstitutional, the whole act doubtless was equally so. By L. 1864, p. 61, c. 18, the legislature appointed O. C. Merriman, John S. Pillsbury, and John Nicols the sole regents of the university for a term of two years. This was an emergency measure. University affairs had come to such a pass that a compact, executive committee of men of outstanding competence was needed to put the institution on its feet. The result justified the means as a practical expedient. By L. 1866, p. 33, c. 11, the terms of Pillsbury and his associates were continued for another two years. L. 1868, p. 1, c. 1, was another law for the stated purpose of reorganizing and providing for the government and regulation of the university. (The agricultural college was established under this act.) The board of three regents was dissolved and a new one of nine substituted. The governor and superintendent of public instruction were made ex officio members. The other seven were to be appointed by the governor with the advice and consent

of the senate—two for one year, two for two years, and three for three years, their successors to serve for three years. Other laws, said with good reason to project legislative control over university administration, are L. 1872, p. 55, c. 10; L. 1889, p. 459, c. 266; L. 1895, p. 136, c. 15; L. 1907, p. 116, c. 105; L. 1923, p. 640, c. 429. Others, too numerous for profitable present mention, are referred to in appellant's brief. The present board is appointed under L. 1923, p. 640, c. 429. It consists of the governor, the commissioner of education, the president of the university, and one member for each congressional district appointed by the governor with the advice and consent of the senate. L. 1901, p. 128, c. 122, is stressed because it is the law creating the board of control and purporting to give it full authority in the financial affairs of the university, particularly as to construction of buildings and purchase of supplies and equipment. L. 1905, p. 148, c. 119, withdrew the university from the operation of that act, except as to the purchase of fuel and the erection of buildings.

There is thus abundant ammunition for the argument of practical construction. But the case furnishes it no target. We cannot even adopt it as a buttress for a conclusion already reached, as is sometimes done. State ex rel. Hilton v. Sword, 157 Minn. 263, 265, 196 N. W. 467. A practical construction of anything written —constitution, statute, or contract—is but an aid to interpretation, not to be resorted to unless such an aid is required. In a real but broad sense, it is true that "words always need interpretation; that the process of interpretation inherently and invariably means the ascertainment of the association between words and external objects; and that this makes inevitable a free resort to extrinsic matters for applying and enforcing the document. * * * All the circumstances must be considered which go to make clear the sense of the words." 5 Wigmore, Ev. (2 ed.) § 2470(3). But when that sense is made or becomes plain, the process of interpretation ends. In construing a constitutional provision or any writing, first resort is to letter and spirit. That implies application of writing to subject matter. If without going farther the meaning is plain, inter-

pretation is at an end.   Resort cannot then be had to the extraneous to obscure what is already clear, and so start again the process of construction and excuse resort to further extraneous aids.   The extraneous or subsequent cannot be resorted to as a means of refuting what is inescapable from the instrument itself in application to its subject.   It is not then permissible to adopt any different practical construction of a constitution, however long continued or well established, or however distinguished its authorship.   Hence, every authoritative statement of the doctrine of practical construction makes it applicable only in a case of doubtful meaning.   See for example, Springer v. Philippine Islands, —— U. S. ——, 48 S. Ct. 480, 72 L. ed. 522, 527.   The doctrine is allowed its "full legitimate force   *   *   *   to solve in its own favor the doubts which arise on reading the instrument to be construed."   1 Cooley, Const. Lim. (8 ed.) 151.   It may illustrate or confirm, explain doubt or expound obscurity, but "it can never abrogate the text, it can never fritter away its obvious sense, it can never narrow down its true limitations, it can never enlarge its natural boundaries." 1 Story, Const. (5 ed.) § 407.

Where the controlling words have a definite meaning and involve no absurdity or self-contradiction, "then that meaning apparent upon the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed.   In such a case there is no room for construction.   *   *   *   Neither courts nor legislatures have the right to add or to take away from that meaning. *   *   *   It must be very plain, nay, absolutely certain, that the people did not intend what the language they have employed, in its natural signification, imports, before a court will feel itself at liberty to depart from the plain reading of a constitutional provision."   State ex rel. Childs v. Sutton, 63 Minn. 147, 150, 65 N. W. 262, 30 L. R. A. 630, 56 A. S. R. 459, quoting from Newell v. People, 7 N. Y. 9, 97.   Compare State ex rel. Putnam v. Holm, 172 Minn. 162, 215 N. W. 200.   Were the courts, simply because of its extended duration, obliged to follow an erroneous practical construction of a plain provision of it, a constitution could be amended with-

out consulting the people. Nothing is farther from the basic theory of our government. "When the meaning and scope of a constitutional provision are clear, it cannot be overthrown by legislative action, although several times repeated and never before challenged." The delay in presenting the question is no excuse for not giving it full consideration and determining it in accordance with the true meaning of the constitution. Fairbank v. U. S. 181 U. S. 283, 311, 21 S. Ct. 648, 45 L. ed. 862.

We find it unnecessary to discuss the argument based upon the debates in the state constitutional conventions. They show nothing opposed to our conclusions. They are but another aid to be resorted to only in case of doubt. To us, the language of art. 8, § 4, of the constitution of Minnesota admits of no doubt. So, deferentially. as we regard the long entertained legislative assumption of power to direct university management, we are constrained to hold that it has no basis in the constitution and is so clearly in violation thereof that no amount of use can validate it. The whole power to govern the university, we repeat, was put in the regents by the people. So no part of it can be put elsewhere but by the people themselves.

With the policy we have nothing to do—except that, recognizing the mandate of the constitution, we must give it effect as litigation before us furnishes the occasion and imposes the duty of deciding which of two conflicting laws we must enforce, the paramount rule of the constitution or the subordinate law of the legislature. The constitution of the state has declared, in effect, that the management of the university shall be, until the people themselves say otherwise, in a relatively small, slowly changing board, chosen for their special fitness for and interest in the work. The early working of the plan did not justify it. The board was considered so large as to be cumbersome and the *method* of its election "a most pernicious one." Forty Years of the University of Minnesota, Johnson, p. 26. But whatever or howsoever just the criticism, the purpose of the constitution remains clear. It was to put the management of the greatest state educational institution beyond the

dangers of vacillating policy, ill informed or careless meddling and partisan ambition that would be possible in the case of management by either legislature or executive, chosen at frequent intervals and for functions and because of qualities and activities vastly different from those which qualify for the management of an institution of higher education. Sterling v. Regents, 110 Mich. 369, 68 N. W. 253, 34 L. R. A. 150. That history shows the dangers just mentioned not greatly to be feared from Minnesota legislatures and predicts that they would be no more so from Minnesota governors, has nothing to say to the issue. Constitutional limitations are not to be ignored because no harm has come from past infractions or because a proposed violation has a commendable purpose. "The tendency to sacrifice established principles of constitutional government in order to secure centralized control and high efficiency in administration may easily be carried so far as to endanger the very foundations upon which our system of government rests." State ex rel. Young v. Brill, 100 Minn. 499, 502, 111 N. W. 294, 639, 10 Ann. Cas. 425. It is in such fashion that the friends of free government may sap its foundations by measures they intend for its benefit. 1 Warren, Supreme Court, 305.

Judgment affirmed.

HILTON, J. took no part.