EDWARD FANNING AND OTHERS v. UNIVERSITY OF MINNESOTA AND OTHERS.[1]

April 17, 1931.

No. 28,247.

[1]Reported in 236 N. W. 217.

*Harris Richardson,* for appellants.

*Henry N. Benson,* Attorney General, *Charles E. Phillips* and *John F. Bonner,* Assistant Attorneys General, and *Everett Fraser,* for respondents.

224

DIBELL, J.

Taxpayers' suit to enjoin the defendants from erecting a dormitory on the campus of the University of Minnesota. There were findings and judgment for the defendants. The plaintiffs appeal from the judgment.

■ The status of the board of regents and of the university and their relation to the state were considered in State ex rel. University of Minnesota v. Chase, 175 Minn. 259, 220 N. W. 951, 954. The question arose upon a controversy between the board and the commission of administration and finance created by L. 1925, p. 756, c. 426, 1 Mason, 1927, c. 3A, a body appointed by the governor and subject to executive control, over the power of the board to establish a plan of group insurance for members of the faculty and employes and incur expense in doing so; and the result was a holding that the board charged with the government of the university had power to establish such plan and in respect of it was immune from legislative interference or executive control.

By L. 1851, p. 9, c. 3, entitled "An act to incorporate the University of Minnesota, at the Falls of St. Anthony," there was "established in this territory an institution, under the name and style of the University of Minnesota." The government was vested in the regents. They were made a body corporate. It was made their duty to enact laws for the government of the university. They were directed to procure a suitable site for buildings and proceed to erect them as soon as funds were provided. The last section of the act, § 20, provided: "The legislative assembly may at any time, alter, amend, modify or repeal this act." It was in form repealed by L. 1860, p. 264, c. 80, § 17.

In State ex rel. University of Minnesota v. Chase, 175 Minn. 259, 220 N. W. 951, it was held that the board and the university had the powers granted by the territorial assembly, L. 1851, p. 9, c. 3, which were perpetuated in the university by art. 8, § 4, of the constitution adopted in 1858 in language as follows:

"The location of the University of Minnesota, as established by existing laws, is hereby confirmed, and said institution is hereby

declared to be the 'University of the State of Minnesota.' All the rights, immunities, franchises and endowments heretofore granted or conferred are hereby perpetuated unto the said university; and all lands which may be granted hereafter by Congress, or other donations for said university purposes, shall vest in the institution referred to in this section."

It was suggested at argument that the provision for repeal, § 20, quoted above, was not considered in the Chase case. An examination of the record shows that the provision for repeal was noted in the brief of the university. The opinion expressly mentions it and says [175 Minn. 265]:

"So the university, in respect to its corporate status and government, was put beyond the powers of the legislature by paramount law, the right to amend or repeal which exists only in the people themselves."

In State ex rel. Smith v. Van Reed, 125 Minn. 194, 145 N. W. 967, 968, involving the exercise of the power of eminent domain in taking private property for a right of way to connect by street railway the university campus and the university farm, reference was had to § 20; and Judge Taylor, referring to the territorial statute of 1851 and to the constitution of 1858, said [125 Minn. 198] that "this constitutional provision did not change the character of the university, nor make it a private or independent corporation; but perpetuated it as a public institution, and took from the legislature the power to discontinue, or abolish it, or to convert it into a private corporation. * * * But it has always been recognized as a public institution, forming a part of the educational system of the state, and no attempt has ever been made to give it any other or different character."

Of the effect of the adoption of the constitution there is no doubt. The people by their constitution chose to perpetuate the government of the university which had been created by their territorial legislature in a board of regents, and the powers they gave are not subject to legislative or executive control; nor can the courts at the

suit of a taxpayer interfere with the board while governing the university in the exercise of its granted powers. This does not mean that the people created a corporation or institution which is above the law. The board must keep within the limits of its grant. It is charged with the duty of maintaining a university for the purpose of higher education. This does not mean that the university must have the limitations of colleges of 1851 or 1858. The statute and constitution intended a university which would grow and develop and undertake activities in the way of research and in other respects not then visualized in the dreams of its founders. There are many things which the board may not do. It does not claim otherwise. In a real sense the property of the university is the property of the state, which through its taxpayers is its chief supporter. The board cannot divert it to other than university purposes. It must govern a university which the territorial statute and the constitution established and perpetuated. The people gave it in charge of the board and may take it away as they gave it; for, after all, when the theorizing as to the relationship of the board and the university and the state is at an end, the university is the people's university. It does not rule; it serves.

■ The power to construct buildings is given by the territorial act. The power to govern a university implies the power to construct buildings. It is not urged that dormitories do not serve a public use. They afford housing. Aside from physical housing, educators think that they play a valuable part in university training. The legislature might appropriate money for their construction. It has not done so. The university may build, but it must have money. If it has money not otherwise appropriated it may use it for dormitory purposes. Whether it shall build is a question of policy with which the board is concerned and in the determination of which we have no voice. The policy is for the university authorities, and the university authorities are the regents.

■ In the enlargement of its campus the university acquired property upon which there were houses. Rentals accrue from them. By L. 1927, p. 670, c. 442, § 2, the legislature in making an

appropriation for the partial support of the university, there being many other sources of income not mentioned here, attached a proviso noted below:

"1. For maintenance and special equipment, available for the year ending June 30, 1928, ........................$3,275,000.

"* * * Provided, that the money derived from rents when and as collected from the buildings on the campus is hereby appropriated for the maintenance and improvements of the University campus."

The board proposes to use the accrued rentals and those to accrue in building a dormitory to cost $300,000. It is conceded that if the university accepts a donation or appropriation it must take it with the conditions attached. State ex rel. Black v. Board of Education, 33 Idaho, 415, 196 P. 201; Board of Regents v. Auditor General, 167 Mich. 444, 132 N. W. 1037. It may take it with the conditions, or it may leave it alone. The plaintiffs urge that the words of the proviso constitute a condition and do not permit the use of the campus rentals for the construction of a dormitory. Assuming that the proviso is a condition to the taking of the $3,275,000, though we do not decide that it is, it fairly may be said that a dormitory is an improvement within the meaning of the statute. It was not the legislative intention to restrict the maintenance and improvement of the campus to the construction of driveways, walks, the planting and care of trees and shrubbery, the erection of memorials, and other uses proper in themselves. The construction is liberal in support of legitimate university growth. There is nothing anomalous in considering a dormitory an improvement of the campus, though likely the legislature did not have such an improvement specifically in mind.

■ Besides, the campus rentals all the time were subject to the disposition of the board for university purposes. The legislature by the proviso assumed to give the university that which was its own. The board, so far as we are advised, had not asserted a right to the full exercise of its powers until about the time of the Chase

case. The practical construction preceding we held not sufficient to affect the meaning of the constitution. And, having the right of disposition, the board could use campus rentals for the building of a dormitory without a legislative appropriation for such purpose and in spite of an appropriation for a different one. See State Board of Agriculture v. Auditor General, 226 Mich. 417, 197 N. W. 160; McClain v. Regents of University, 124 Or. 629, 265 P. 412; State v. Regents of University, 32 N. M. 428, 258 P. 571. This disposition of campus rentals had been made for many years. The act of 1927 is typical. The legislature of 1929 recognized that it was without authority over them by omitting a similar proviso. L. 1929, p. 587, c. 409.

■ The university has a so-called university press intended primarily for its own publications and incidental university uses. It prints for the departments and charges them. This is a matter of accounting. It does work not connected with university purposes at not less than current rates. These earnings it puts in the dormitory fund. The earnings are incidental to the use of the plant for university purposes. The board has not established a printing plant in competition with private plants and does not contemplate doing so. It is only this, that earnings accrue for work conveniently done by its press but wholly incidental to its main use for proper university purposes, and it chooses to use them in building a dormitory. There is no legal objection.

■ The board proposes to finance the building of the dormitory by using the net earnings of the dormitory, the campus rentals, and the earnings of the press, and to anticipate earnings to the extent of $215,000 by undertaking to apply them as received for money now to be advanced. It is its plan to issue under a trust agreement what it terms "4½% Dormitory Serial Gold Bonds" engraved or lithographed like other bonds. Externally these writings have the appearance of bonds with which the public are familiar. Inwardly they are a pledge of the income stated and an undertaking to apply it. No debt is created. It is specified in detail and with some repetition that neither the dormitory, nor the land upon

which it is built, nor other property of the university or the state, saving the income mentioned, shall be security; and no personal or debt liability rests upon the state, the board, the university, or an officer. A clause in the trust agreement which is termed an "immunity" clause is as follows:

"Neither the dormitory, or the land upon which it is built, or any other property of the University excepting only the 'net proceeds' (and 'rentals') as defined in Section 5 Article Three hereof shall be security for, or be ever levied upon and sold to satisfy this bond and no recourse under or upon any obligation, covenant, stipulation or agreement contained in this Agreement or in any bond or coupon issued hereunder or because of the creation of any indebtedness hereby authorized shall be had against the State of Minnesota, the Regents of the University of Minnesota, or any member or officer of its Board of Regents, or any of their successors, by the enforcement of any assessment or by any legal or equitable proceeding by virtue of any constitution, statute or rule of law however established; it being expressly agreed and understood that the bonds and this Agreement and the obligations hereby created are solely the obligations of the Regents of the University as a corporation secured by and payable only out of said 'net proceeds' (and 'rentals') as defined in Section 5, Article Nine hereof, and that no personal liability whatever shall attach to or be incurred by the State of Minnesota, the Regents of the University, or any member or officer of its Board of Regents or their successors and that any and all personal liability of any name and nature and any and all rights and claims against the State of Minnesota, the Regents of the University of Minnesota, and the members and officers of its Board of Regents growing out of or founded on said bonds and this trust agreement, arising on any covenant, stipulation or agreement contained in this trust agreement or otherwise whether at common law or in equity or created by any constitution, statute or other rule of law, howsoever established, are hereby expressly waived and released as a condition and as a part of the consideration for the execution and delivery of this agreement and the issue of the bonds and coupons."

There can be no assertion of a right by the holders of the bonds against university property except the specified income. Otherwise there is no attempt to pledge university or state property. There is no individual liability or state or board or university money obligation sought to be created. If the board finds this a convenient way of dealing with money coming to it and subject to its disposal, it may make use of it. Thereby it does not create or contract a debt of the state or pledge its credit within the inhibitions of art. 9, §§ 5-9, of the constitution.

Judgment affirmed.

[1]Reported in 236 N. W. 211.