# STATE EX REL. HARRY H. PETERSON v. RAY QUINLIVAN.[1]

September 11, 1936.

No. 30,765.

[1]Reported in 268 N. W. 858.

66

*Harry H. Peterson,* Attorney General, and *Frederic A. Pike,* Assistant *Attorney General,* for relator.

*Ray Quinlivan* and *G. A. Youngquist,* for respondent.

STONE, JUSTICE.

Original proceeding on relation of the Honorable Harry H. Peterson, attorney general, by information in the nature of *quo warranto,* challenging the right of respondent, the Honorable Ray Quinlivan, to be a regent of the University of Minnesota. Mr. Quinlivan claims under an election by joint convention of both branches of the legislature, February 7, 1935. That choice was valid unless, as the attorney general contends, the legislature has no constitutional power to elect regents of the University because that function is constitutionally part of the executive function of the governor.

The University was incorporated in territorial days by L. 1851, c. 3. Sections 4, 5, 6, and 7 were as follows:

"Sec. 4. The government of this University shall be vested in a Board of twelve Regents, who shall be elected by the Legislature as hereinafter provided.

"Sec. 5. The members of the Board of Regents shall be elected at the present session of the Legislature, and shall be divided into classes, numbered one, two, and three; class numbered one shall hold their offices for two years; class numbered two, for four years, and class numbered three, for six years, from the first Monday of February, one thousand eight hundred and fifty-one; biennially thereafter there shall be elected in joint convention of both branches of the legislature, four members to supply the vacancies made by the

provisions of this section, and who shall hold their offices for six years respectively.

"Sec. 6. Whenever there shall be a vacancy in the office of Regents of the University, from any cause whatever, it shall be the duty of the Governor to fill such office by appointment, and the person or persons so appointed, shall continue in office until the close of the session of the Legislature, then next thereafter, and until others are elected in their stead.

"Sec. 7. The Regents of the University and their successors in office, shall constitute a body corporate, with the name and style of the 'Regents of the University of Minnesota,' with the right as such, of suing and being sued, of contracting and being contracted with, of making and using a common seal, and altering the same at pleasure."

Section 9 declared that the "Regents shall have power, and it shall be their duty to enact laws for the government of the University; to elect a Chancellor, who shall be ex-officio, President of the Board of Regents," and to "appoint the requisite number of professors and tutors" for the faculty.

Under § 7 the regents constituted the "body corporate," which continued, in form at least, under the act of 1851, until Minnesota became a state in 1858. Then the state constitution (art. 8, § 4) confirmed the location of the University "as established by existing laws," adding this: "and said institution is hereby declared to be the 'University of the State of Minnesota.' All the rights, immunities, franchises and endowments heretofore granted or conferred are hereby perpetuated unto the said university."

That constitutional provision controlled decision in State ex rel. University of Minnesota v. Chase, 175 Minn. 259, 220 N. W. 951, and Fanning v. University of Minnesota, 183 Minn. 222, 236 N. W. 217. Because the "rights, immunities, franchises and endowments" granted by the act of 1851 were "perpetuated unto" the University, we held unconstitutional L. 1925, c. 426, insofar as it attempted, in respect to the control of University finances, to subject the regents to supervision by the commission of administration and finance, created by the act of 1925.

68

As an immediate result, the then attorney general, the Honorable G. A. Youngquist, ruled that appointment of regents was controlled by the law of 1851. His view was that:

"Under the recent decision of our supreme court, it is my opinion that the organization of the board of regents is controlled by chapter 28 of the 1851 Statutes. The right of succession of the corporation through the selection of the members of the board of regents is integral with the existence of the corporation itself, and under the principles laid down by the supreme court the legislature was without power to alter the method of succession provided for by the 1851 Statute."

For long, pursuant to statutes passed under a misconception of fundamental law, regents of the University had been appointed by the governor. The latest such statute is L. 1923, c. 429, § 1 (1 Mason Minn. St. 1927, § 3110). It would be controlling were it not unconstitutional, as it is, for the reasons stated in the Chase case and reconsidered herein. It provides in part as follows:

"The government and general educational management of the state university is hereby vested in a board of regents, consisting of the governor, the commissioner of education and the president of the university, all as ex-officio members, and one member from each congressional district of the state to be appointed by the governor by and with the advice and consent of the senate."

Mr. Youngquist's advice was that there would have to be a return to election of regents by the legislature, under the law of 1851. It was followed until the present attorney general, the Honorable Harry H. Peterson, took the view, expressed in a formal opinion to the governor July 8, 1935, that the matter was not controlled by the Chase case and that, upon grounds now to be considered, the governor and not the legislature had the constitutional power to appoint the regents.

Our decision is that the people of the state, speaking through their constitution, have explicitly and purposefully declared that the regents, 12 in number, shall be elected by "joint convention" of their own representatives in the legislature. We consider that in-

escapable under the constitutional provision perpetuating "the rights, immunities, franchises and endowments" granted by the act of 1851.

■ We have given attentive consideration to all the searching and voluminous argument of the attorney general, the content of which, both historical and legal, is commensurate in quantity and quality with the importance of the issue. Without so deciding, we assume validity for its first proposition, which is that, insofar as the act of 1851 attempted to vest in the legislature, rather than in the territorial governor, the power of appointing the regents, it was void because in contravention of "the organic law of Minnesota, which provides for a distribution of the power of the territorial government among the three departments thereof and vests the power of making appointments exclusively in the governor." See §§ 2, 4, 6, 7, and 9 of the "Organic Act" (1 Mason Minn. St. 1927, viii, ix).

We take also the attorney general's postulate that the regents are officers within the meaning of the declaration of the state constitution, art. 5, § 4, that the governor "shall have power, by and with the advice and consent of the senate, to appoint a state librarian and notaries public, and such other officers as may be provided by law." We need not inquire whether the regents in office when the constitution was adopted could have had benefit, if needed, from the confirmation of the constitutional "schedule." Section 5 thereof declares that "all territorial officers, civil and military, now holding their offices under the authority of the United States, or of the territory of Minnesota shall continue to hold and exercise their respective offices until they shall be superseded by the authority of the state."

The next step, both of chronology and reason, puts us on the constitutional threshold where we find confirmation of the territorial charter of the University and its perpetuation, no less, insofar as it had attempted to grant "rights, immunities, franchises and endowments." Whatever the University was as a corporation at the birth of the state, from then on it was a body corporate, holding in

perpetuity the things which the constitution declared that it should so hold.

Upon the postulate that its territorial charter was unconstitutional insofar as it provided for legislative election rather than executive appointment of regents (Clayton v. Utah Territory, 132 U. S. 632, 10 S. Ct. 190, 33 L. ed. 455; Springer v. Philippine Islands, 277 U. S. 189, 48 S. Ct. 480, 72 L. ed. 845) it would be an interesting study to appraise the territorial status of the University. See Field, "The Effect of an Unconstitutional Statute," cc. I & III. One conclusion might be that, as against collateral attack, there was at least a *de facto* corporation with *de facto* regents. Smith v. Sheeley, 79 U. S. 358, 20 L. ed. 430; Richards v. Minnesota Sav. Bank, 75 Minn. 196, 77 N. W. 822.

Were we to follow the extreme and unrealistic "void *ab initio*" view, we would yet be unable to escape these obdurate *facts:* (1) The territorial charter, even though void in whole or in part, and its territorial amendments were characterized by the valid constitutional provision as "existing laws." (2) Good or bad, there had been set up an "institution" which by the constitution was "declared to be the 'University of the State of Minnesota.'" (3) Its regents, even if until then functioning under an unconstitutional statute, were designated as the "Regents of the University," who with their successors in office were constitutionally regarded as "a body corporate" in perpetuity. From then on the University, whatever the legal status from time to time of its regents, was a corporation *de jure*.

We come next to evaluation (to the extent presently needed) of the "franchises" confirmed and perpetuated by the state constitution. If government by 12 regents, elected by joint convention of the legislature, is part of such franchises, as we hold it is, there is an end of the matter. It may or may not be important that the plural "franchises" was used. The mere right to be a corporation is seldom, if ever, all there is of the principal franchise of a corporation. It includes also the quality of durability, and the manner chosen to insure succession for a limited period or in perpetuity.

The regents at the time being were the "body corporate." L. 1851, c. 3, § 7. How was it to be perpetuated? What was the mechanism of corporate succession? How was its proper working assured? If the constitution has answered, it is not for the legislature but only for the people themselves, by amendment, to change the answer. What are the scope and context of a franchise to be a corporation is not to be answered by affirming merely that it confers the right to be a corporation. Remains consideration of, and answers to, the queries: What kind of a corporation? How to be governed and for what purpose? In what manner and to whom is succession to go?

The constitutional perpetuation of "rights, immunities, franchises and endowments" is somewhat redundant because of the inclusive nature as applied to corporations of the word "franchise," which "is generally used to designate a right or privilege conferred by law." 2 Morawetz, Private Corporations (2 ed.) § 922. That being so, the general franchise to be a corporation is necessarily subject to the conditions and limitations expressed by the grant, both as to purpose and manner of exercise of the franchises. The selection of the original grantees and the method of determining who shall succeed them, when fixed by the grant, are of its essence and so a conditioning part of the franchise.

We are considering a "primary or creating franchise" (3 Thompson, Corporations [2 ed.] § 2863) and not "secondary or special franchises" (Id., § 2865). "The right to be a corporation" is the primary franchise, residing "in the corporation itself. * * * Unlike a conventional contract between natural persons, the state is a party to it, and when the legislature has prescribed the nature and extent of the franchise, and how it shall be exercised, the courts will never permit it to be enlarged or changed by a usage or custom in violation of the statute." State ex rel. Brun v. Oftedal, 72 Minn. 498, 514, 75 N. W. 692, 697. It is but axiomatic that, if the franchise be granted by a constitution, it cannot be diminished by a statute. It is the primary franchise that gives corporate life. Hence its inclusions cannot be delimited without determining what kind of life is given, to what purpose it is to be lived, and by what

members. The organ designated by the "creating franchise" for insuring corporate functioning and continued life is as much part of the franchise as are its organs part of that unit known as the human body.

It is of utmost significance that the regents are the sole members of, and are, the corporation. Important also that they have both the "power" and are under the "duty to enact laws for the government of the University." First the territorial assembly, and later the constitution, declared for regents—12 in number—to be elected by the legislature for staggered terms. Therefore, the argument that the legislature may provide, and properly has declared, for a board of regents of a possible larger number, to consist of three designated state officers, *ex officio,* and one from each congressional district (L. 1923, c. 429) affirms that the legislature may, by so much, repeal a declaration of the constitution and ordain that the "rights, immunities, franchises and endowments" of the University corporation shall be exercised by others than those whom the constitution selected. That certainly affects, in vital fashion, the primary franchise and is, by so much, in plain contravention of the constitution, and, in consequence, inoperative. The method of electing regents and so assuring corporate succession being of the very essence of the corporation, it is equally so of the franchises which gave it being.

That the perpetuated franchises included the manner of succession is too plain to be made otherwise by any opposed practical construction. State ex rel. University of Minnesota v. Chase, 175 Minn. 259, 220 N. W. 951. Where sovereign power has first granted and then perpetuated a corporate franchise, selecting the original grantees and carefully designating how their successors shall be selected, the original grantees and the method of choosing their successors are "integral" with the franchise itself.

That was of the very essence of decision in Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 653, 4 L. ed. 629. Mr. Chief Justice Marshall said, among other things, that the founders had "contracted for a system, which should, as far as human foresight can provide, retain forever the government of the literary institu-

tion they had formed, in the hands of persons approved by themselves."

Mr. Justice Washington expressed the same view in this concise language: "If a law increases or diminishes the number of the trustees, they are not the persons which the grantor agreed should be the managers of the fund." 4 Wheat. 518, 662, 4 L. ed. 629, 665.

Mr. Justice Story was of the opinion that "the rights acquired by the charter" would "be impaired if the legislature should take the right of election from the stockholders, and appoint directors unconnected with the corporation." 4 Wheat. 518, 711, 712, 4 L. ed. 629, 677.

In Chicago City Ry. Co. v. Allerton, 18 Wall. 233, 21 L. ed. 902, the holding was that, unless it had been expressly reserved, there was no power in the legislature to adopt as to a corporation "a reconstruction of the body itself" or an enlargement of its capital stock. "Changes in the purpose and object of an association, or in the extent of its constituency or membership, * * * are necessarily fundamental in their character, and cannot, on general principles, be made without the express or implied consent of the members. The reason is obvious." 18 Wall. 233, 235, 21 L. ed. 902, 903.

Involved in University of North Carolina v. Maultsby, 43 N. C. (8 Iredell's Eq.) 227, was a public corporation. The distinction was made between that kind of an artificial entity and one of a private character. The court said [43 N. C. 263]:

"The admission or exclusion of members, the qualification of directors or trustees, the mode of keeping up their succession, and the government of such corporations, are absolutely fixed by the charter, and can only be modified by the concurring will of the Legislature and the corporations."

From the standpoint of their capacity to take and hold franchises, we need not distinguish between public and private corporations. We are dealing with a public corporation, the rights and franchises of which, whatever they are, have been confirmed in perpetuity by the state constitution. The inquiry, therefore, is not as to the

capacity of the corporation to take and hold them, but rather as to the content of the franchises which it does hold.

■ There has been much argument that to take away from the governor and vest in the legislature the power to select the regents is unconstitutional because in violation of the rule of both national and state constitutions requiring division of the powers of government between legislative, executive, and judicial departments. That view is untenable.

The declarations of articles I, II, and III of the Federal Constitution, concerning departmentalization, have their whole effect on the national government. The guaranty of a republican form of government for every state (art. IV, § 4) does not require departmentalization. Such division cannot be between "fields of black and white" or "into watertight compartments." (Mr. Justice Holmes, dissenting in Springer v. Philippine Islands, 277 U. S. 189, 209, 211, 48 S. Ct. 480, 485, 72 L. ed. 845, 852, 853.

What should be the fundamental scheme of government in any state is left to its own constitution. Whether the state plan is a "republican form" is a political question for decision by congress and not the courts. Ohio ex rel. Bryant v. Akron Metropolitan Park District, 281 U. S. 74, 79, 50 S. Ct. 228, 230, 74 L. ed. 710, 66 A. L. R. 1460; Cochran v. Louisiana State Board of Education, 281 U. S. 370, 50 S. Ct. 335, 74 L. ed. 913. In the former, no federal question was raised by a claim that state law had unconstitutionally delegated "legislative power to the probate court and to the non-elective park commissioners."

"The Organic Act of Minnesota" (passed March 3, 1849, 1 Mason Minn. St. 1927, viii) was the "fundamental law" of the territory. Such organic laws of territories bear "a relation to their governmental affairs not unlike that borne by a state constitution to the state." Springer v. Philippine Islands, 277 U. S. 189, 200, 48 S. Ct. 480, 481, 72 L. ed. 845, 848. But they do not ordinarily attempt to dictate terms which the people of a territory must put into their constitution in order later to be admitted as a state. The "act authorizing a state government" for Minnesota (passed February 26, 1857, 1 Mason Minn. St. 1927, xii) did impose some conditions,

not now important. Nothing in the state constitution violated it. If there had been violation, it would have been cured by the act of admission (passed May 11, 1858, 1 Mason Minn. St. 1927, xiv) declaring Minnesota to be "one of the United States of America, and admitted into the union on an equal footing with the original states in all respects whatever."

Departmentalization is essential in American constitutionalism only because expressly made so. It is not otherwise a *sine qua non* of republican government. If Minnesota by its constitution had adopted the so-called cabinet system, with much amalgamation of legislative and executive power in the same hands, and congress had admitted the state, no one could claim with reason that the latter, by its neglect fully to departmentalize its own powers, had offended against the national constitution. It is not offensive to the ideals of popular government, which are but implemented by the constitutional "republican form," that the people in their state constitutions have reserved the right to elect many of their officers. By the same token, there is no conflict with the fundamentalism of practical democracy in the election of such officers by representatives of the people chosen for that purpose. That was the theory of the electoral college as originally established. So the question in respect to the university regents, regarded as state officers, is not whether the people, speaking through their constitution, had the power to declare for election by the legislature. Rather and only the question is: Have they so declared? We are clear that they have.

Assuming any amount of original deficiency, the effect of adoption of the state constitution upon the then status of the University, aside from perpetuating whatever it did perpetuate, was, as to the "existing laws" under which the "institution" was then functioning, that, at least, of a valid curative act. We have no occasion to speculate upon the effect of University transactions preceding statehood. It is enough to affirm the obvious fact that since then it has been a public corporation, the organization of which was at least validated and confirmed by the constitution. Assuming either fractional or total invalidity of the corporate organization until then, statehood brought whatever cure was needed for the defects.

The curative operation of the constitution was analogous to that of an act of congress removing a federal obstacle to the operation of a state statute. Mr. Field, whose refreshing study has already been cited ("The Effect of an Unconstitutional Statute"), says at page 286:

"The rule to be derived from the cases seems pretty clearly to be that such [inoperative state] statutes may be revived in this manner * * *. The situation has arisen several times in connection with interstate commerce. Federal and state cases have agreed that no reënactment of the state statute is required if Congress has permitted the state to occupy the field previously denied to the states by supreme court decision."

He cites Blair v. Ostrander, 109 Iowa, 204, 80' N. W. 330, 47 L. R. A. 469, 77 A. S. R. 532, as an illustration. It holds that reënactment of the state statute, where congress has removed the barrier limiting an invalid state statute providing that liens upon land in the county are binding only as filed in the county, were revived by a later statute providing that federal courts should recognize liens according to state law.

The same author is equally apt in his statement at page 289, that "a new constitution or a constitutional amendment may, of course, expressly recognize existing statutes, or doubtless even expressly validate statutes that have been declared unconstitutional." It may accomplish the same result for laws which theretofore were unconstitutional, but had not been so declared. That is precisely what happened to the "existing" territorial laws under which the University was organized if, as we assume, they were ever invalid in whole or in part.

Section 2 of the "schedule" of the state constitution declared that all laws then "in force" in the territory "not repugnant" thereto "shall remain in force until they expire by their own limitation, or be altered or repealed." Thereon the attorney general bases the claim that the territorial charter, insofar as it provided for legislative election rather than gubernatorial appointment of the regents, was not confirmed and carried into state law, because "invalid under the organic act of Minnesota and because * * * unconstitu-

tional under the constitution of the United States." The territorial law (L. 1851, c. 3) "never had any force," he says, "as law" and was "incapable of remaining in force as such." That argument fails because it ignores the explicit manner in which the state constitution, by inclusive reference to "existing laws," declared the "institution" thereby established to be the "University of the State of Minnesota," and made the regents, elected and to be elected, the holders in perpetuity (subject to constitutional amendment) of the "rights" and "franchises" "heretofore granted," *i. e.,* those attempted to be, if not actually, conferred by the "existing laws" of the territory. The intention so plainly declared was to continue the corporation under the territorial statutes, whether or no, up to that time, they had been "in force," as valid law. With such emphatic and purposeful confirmation of a specific grant, which the grantors assumed to be good, there is no room for argument that the general language of § 2 of the "schedule," supposed to have excluded from continuation all territorial laws not then "in force in the territory" because constitutionally invalid, included or affected the very statutes so explicitly carried over by the fundamental law of the state. We refuse to say that the state constitution, by art. 8, § 4, first established all of the university corporation and then by the "schedule" disestablished any part of it.

The whole matter of University administration is removed from the field covered by our state constitutional provision (art. 3, § 1) for division of the powers of government into legislative, executive, and judicial departments. The subject is one of state rather than federal jurisdiction and is a typical case showing the control by a *special* rule of a matter thereby excepted from the *general* law that otherwise would govern. We have a similar special exception in art. 6, § 2, of our state constitution. It makes the clerk of the supreme court one of the elective state officers. But to the judges is given the power to fill any vacancy in that office until an election can be legally had. There, surely, is a case which the constitution itself excepts from the general rule vesting in the governor the power of appointment. Just as clearly is there an exception from that power created by the constitutional provision confirming and

perpetuating corporate succession to University regents elected, and to be elected, in joint convention of the legislature. Such election does not violate the constitution for the reason that the constitution itself, by a special rule on the very subject, has selected legislative election as the manner of assuring succession of the corporate franchises in the manner stipulated in the original grant.

That is enough to distinguish finally and broadly all cases in the same category with State ex rel. Young v. Brill, 100 Minn. 499, 111 N. W. 294, 639, 10 Ann. Cas. 425, holding that generally the power of appointment is in the executive and that it cannot constitutionally be placed elsewhere by the legislature. It cannot be so placed, under any three-way, constitutional division of power, unless the constitution itself so declares. In the case of the regents of our University the constitution has so provided. If they are officers, they are not within the *general* appointing power of the governor for the simple reason that, by the *special* provision concerning the University, they are excepted therefrom. Article 8, § 4, is to us a plain mandate for their election by the legislature as provided by the act of 1851. That method of implementing and assuring corporate succession was of the essence of the franchises constitutionally perpetuated. Surely, if the constitution had not intended to perpetuate the "existing" method of succession, it would have continued it conditionally or chosen another.

That brings our consideration and resulting decision to an end. It establishes that respondent, having been elected as regent in the manner provided by the constitution, has *good* title to his office, and he should be and is hereby confirmed therein.

Whether, as matter of policy rather than law, the result is wise or right, or both, or the opposite, we do not know. As judges, it is just no concern of ours whether the policy of plain law is good or bad. As Lord Mansfield once said for and of judges and as an admonition to an excited London populace attempting improperly to dictate to his court: "We are to say, what we take the law to be: if we do not speak our real opinions, we prevaricate with God and our own consciences." Rex v. Wilkes, 4 Burr. 2527, 2562, 98 English Reports (Reprint) 327, 347. We thus emphasize the nature of

our judicial function—we have no other—for the information of those who blame and sometimes reprobate courts for decisions which are just inescapable for judges who refuse to "prevaricate" with themselves.

Our order to show cause will be discharged.

So ordered.

DEVANEY, CHIEF JUSTICE, took no part in the consideration or decision of this case.

